# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DELTA SIGMA THETA SORORITY, INC.  )
1707 New Hampshire Avenue, NW   )
Washington, DC 20009       )
              )
   Plaintiff,       )
              )
   v.          )
              )
              )
DEREK & JAMAR PRODUCTIONS, LLC  )
764 Gramatan Avenue      )
Mt. Vernon, NY 10552      )
              )
   Defendant.      )
_____ )

## COMPLAINT FOR INJUNCTIVE AND MONETARY RELIEF

Delta Sigma Theta Sorority, Incorporated ("Delta" or "Plaintiff") brings this civil action against Derek & Jamar Productions, LLC ("defendant" or "Derek & Jamar") and complains and alleges as follows.

## IDENTITY OF THE PARTIES

1. Plaintiff Delta is a not-for-profit, membership service organization that was founded in 1913 on the campus of Howard University and that is incorporated under the laws of the District of Columbia. Its offices are located at 1707 New Hampshire Avenue, Washington, District of Columbia.

2. Defendant is a limited liability company formed under the laws of the state of New York, with its principal place of business at 764 Gramatan Avenue, Mount Vernon, New York. On information and belief, defendant is not authorized to transact business in the District of Columbia.

3.     At all times relevant to this litigation, defendant has transacted business in the District of Columbia, and, in transacting that business, caused an injury to Plaintiff.

4.     At all times relevant to this litigation, defendant has caused a tortious injury in the District of Columbia by an act or omission outside the District of Columbia. Defendant regularly solicits business in the District of Columbia and has engaged in other persistent courses of conduct in the District of Columbia.

## JURISDICTIONAL STATEMENT

5.     This is a civil action for injunctive relief and damages based on trademark infringement under the federal and District of Columbia common law, and for misappropriation of a trade secret, injurious falsehood and defamation. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 (a) because the action is between citizens of different States, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

6.     This Court has subject matter jurisdiction over the District of Columbia claims asserted herein under principles of pendent and/or ancillary jurisdiction because such claims arise from a common nucleus of operative facts and are so intertwined with the federal claims before this Court as to make the exercise of pendent and/or ancillary jurisdiction appropriate.

7.     This Court has personal jurisdiction over defendant under the District of Columbia's long arm statute, D.C. Code § 13-423, because defendant has voluntarily and deliberately transacted business in the District of Columbia, and has caused a tortious injury in the District of Columbia by an act or omission outside of the District of Columbia. Defendant thus has purposefully directed its activities at residents of the District of Columbia.

## VENUE

8.      Venue is proper in this judicial district under 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to this claim arose in this judicial district.

## NATURE OF THE CONTROVERSY AND FACTUAL BACKGROUND

9.      This is an action by Plaintiff, a well-established, highly regarded and nationally and internationally recognized not-for-profit membership service organization, to prohibit a recently formed company that purports to engage in artistic endeavors from infringing on its trademarks and engaging in activities designed to confuse its members and the public, and from engaging in activities designed to destroy Plaintiff's good name and well earned reputation. Specifically, Plaintiff seeks to prohibit defendant from continuing activities that constitute trademark infringement, misappropriating a trade secret, defamation, and publication of an injurious falsehood in connection with a project it produced known as "The Black Sorority Project."

**Who Delta Is And Why Its Reputation And Goodwill Are Important**

10.     Delta, a not-for-profit, membership organization that focuses on public service, was founded in 1913 on the campus of Howard University by twenty two (22) collegiate women who wanted to establish an organization that would serve as a vehicle for change within their individual communities and within the larger society.  Their first act of social activism was participating in the Suffrage March for Women's Right to Vote.  They were the only African American women's organization to participate in the march, and this act instantly raised their profile and help shaped what the organization would become.  This seminal act in many ways has served as a torch for later members who unerringly have worked to match that effort and keep Delta in the vanguard of social change and cultural and educational advancement.

11.    Since its founding in 1913, Delta has been known to its members, other members of the National Pan-Hellenic Council (an umbrella organization of the nine African American Greek letter organizations), educational institutions, and the general public not only by its official name "Delta Sigma Theta Sorority, Incorporated," but also as "Delta," "Delta Sigma Theta," and "Delta Sorority."   It also is known and recognized by its Greek letter symbols -- $\Delta\Sigma\Theta$. Any iteration of Delta's name and its Greek letter symbols is famous and recognized as belonging only to Delta.

12.    As a membership organization, Delta depends for its very existence on its members.  The sole function of Delta employees is to service the needs of its members so that the members can effectively implement Delta's programs.  The governing body of Delta is an Executive Board comprised of elected and appointed members who act on behalf of the Grand Chapter (all of the chapters of Delta).  The day-to-day operation of Delta is managed by an Executive Director, a 36 year employee of Delta, and her staff.

13.    The organization that began with twenty two collegiate women now has more than 900 collegiate and alumnae chapters located in the District of Columbia and 45 states in the United States and in eight other countries.  Since its founding, Delta has grown exponentially, with tens of thousands of members consistently remaining financially active and tens of thousand more remaining involved in Delta at some level.  More than 10,000 members typically attend biennial national conventions, and each of seven regional conferences (held during the years when there is no national convention) typically hosts thousands of members.

14.    Delta's size has in no way diminished its zeal to carry out the mission of its Founders.  In 1956, Delta established a formal mechanism  -- its Five Point Program Thrust --to allow it to provide service to a greater segment of society.  Its Five Point Thrust includes:

economic development; educational development; international awareness and involvement; physical and mental health; and political awareness and involvement. Delta's profile, name, reputation, and goodwill are continually being enhanced through its much acclaimed public service programs.

15.    One program that has raised the national stature and reputation of Delta as an organization is its annual legislative weekend, now in its seventeenth year, known as Delta Days in the Nation's Capital, where members visit their Representatives and Senators and interact with and hear from members of the Executive Branch and other high level policy makers. Similarly, Delta hosts an annual Delta Days at the United Nations, having been awarded consultative status with the Economic and Social Council ("ECOSOC") of the UN.

16.    The high quality of work and the quality of leadership of Delta's National Arts and Letters Commission, which was established in 1973, have raised Delta's profile. Under the leadership of nationally-recognized artists and educators such as actress Ruby Dee, renowned opera singer Leontyne Price, and noted author Paula Giddings, the Commission has sponsored nationally-acclaimed programs in the visual, literary, and performing arts and has produced works for cultural and educational purposes. In July 2006, it re-mastered in compact disc format the album "Roses & Revolutions," which it produced in 1975 in conjunction with its subsidiary, DST Telecommunications, Incorporated.

17.    Delta's profile also has been enhanced by drawing to its ranks young women whose desire to follow the Founders' mission of improving their community has propelled them into public service on a national level, while they remained actively involved in Delta. National political and policy leaders have readily recognized the quality of Delta's leaders and programs and frequently have sought Delta leaders for public service or as advisors. Patricia Roberts

Harris, Delta's first Executive Director, served as Ambassador to Luxembourg and was appointed to two cabinet positions by President Jimmy Carter, (Secretary of Housing and Urban Development and Secretary of Health and Human Services).  Alexis M. Herman, a past and current Executive Board member, was appointed Secretary of Labor by President Bill Clinton.  Dr. Dorothy I. Height, a Past National President of Delta and civil rights icon, continues to be called upon by national political leaders to provide her insight and viewpoint on issues.  Frankie Muse Freeman, a Past President of Delta and one of the few women who led the fight against segregation, was appointed to serve on the first United States Commission on Civil Rights by President Lyndon B. Johnson and was reappointed three times.  Congresswoman Barbara Jordan, former National Treasurer of Delta, served in the United States Congress with exceptional distinction.  Congresswoman Shirley Chisholm was the first woman to wage a serious campaign for the Presidency of the United States.  Congresswoman Stephanie Tubbs Jones, currently serving in Congress, is the first African American woman to serve on the House Ways and Means Committee.

18.    The national recognition Delta has received over the years has been enviable and longstanding.  Examples of such recognition include the following:   a speech by President John F. Kennedy at Delta's 50th Anniversary Celebration in Washington, District of Columbia in 1963; two invitations from President Lyndon B. Johnson to the Executive Board of Delta to meet with him; inclusion by President Clinton in a select group of community leaders invited to the White House in 1997; a meeting with Senator Bill Frist, Senate Majority Leader, in 2003 to discuss the Republican party's agenda.

**Delta is a Sought-After Business Partner and its Membership List is Highly Desired**

19.    Because of the number of members who remain actively involved in Delta and the number who attend its national conventions and regional conferences and because of the collective strength of the members, entities -- from major corporations to large non-profits, to small businesses and individuals -- seek partnerships or other business arrangements with Delta. For example, Delta recently entered into a partnership with the American Heart Association to sponsor a major health initiative, and with Genworth Financial to participate in a home ownership initiative.  Presently, there are numerous pending requests, from major corporations, other non-profits, and small business or individuals.   Because of Delta's concern about protecting its name, reputation, and image and the potential for exploitation of its members, Delta enters into business arrangements with a select few and guards carefully its membership list, which contains names and contact information.  In fact, so jealously does Delta guard its membership list that it has refused to make the list available to a foundation that was established by Delta and has a mission similar to Delta's.  Delta does not make the membership list available to Delta members.

20.    Delta also receives hundreds of requests from vendors seeking a license to sell products and merchandise imprinted with Delta's name(s) and/or one of its many symbols or marks.  Delta grants a license to only those vendors who meet its licensing requirements.  Over the years, it has granted hundreds of such licenses.  At its 48th National Convention held in July 2006, more than eighty (80) licensed vendors participated.

**Delta Vigorously Protects Its Mark**

21.    Delta vigorously protects its name(s), marks and logos (collectively "marks" or "intellectual property").  Delta pursues all violators of which it is aware and requires that the

7

violators cease and desist operation, pay a fine, and comply with Delta's licensing requirements if they wish to market merchandise using Delta's intellectual property. In fact, Delta has a dedicated staff member whose sole responsibility is to protect Delta's intellectual property, monitor its appropriate use, and pursue violators.

22.    Delta has registered with the United States Patent and Trademark Office the name Delta Sigma Theta Sorority, Incorporated, (Reg. No. 2197647); the Greek letter symbols ΔΣΘ (Reg. No. 2201178); and two Delta logos (Reg. No. 2199610 and Reg. No. 2199609).

23.    Any person or entity interested in obtaining a license to use Delta's name or any of its marks, must complete an application and a Certified Vendors Agreement and is provided a copy of Guidelines for Operating, which includes a Code of Conduct for Vendors. These documents make clear the importance Delta attaches to its intellectual property, and the vendor's compliance obligations. For example, on the vendor's application, among other requirements, the applicant must attest that he/she understands that Delta must grant a license before "anyone may manufacture, design, make, copy, sell, display, or distribute" any items containing Delta's marks. The Vendor Agreement provides, among other requirements, that Delta has the right to inspect any merchandise prior to its sale or distribution and has the right to restrict sale or distribution if the merchandise does not conform to Delta's specification. The Guidelines and Code of Conduct distributed with all licenses reiterates the restrictions Delta imposes upon the use of its name.

**Delta's Dealings with Defendant**

24.    As stated above, Delta does not approve all requests for endorsements or enter into a partnership with every entity that approaches it. Defendant presented a proposal to Delta seeking a partnership with Delta on the Black Sorority Project. After careful review and

consideration of the proposal and the exercise of its legal rights, Delta decided not to enter into a partnership with defendant or otherwise to endorse or support the Black Sorority Project.

25.     Defendant also applied for a vendor's license to exhibit merchandise at Plaintiff's 48th National Convention. Delta denied the request because the application did not conform to its licensing requirements.

26.     On information and belief, Derek Fordjour first approached Delta by letter of May 21, 2003 (on letterhead of "The Fordjour Group, Inc.") from Mr. Fordjour addressed to then-President Gwendolyn Boyd in Washington, District of Columbia. Mr. Fordjour said that he wanted to discuss "a current research project that may be of interest to Delta Sigma Theta Sorority, Inc." An electronic message from Mr. Fordjour to the Executive Director of Delta, Roseline McKinney, reveals that on or about November 5, 2003, Mr. Fordjour met with Ms. McKinney in Washington, District of Columbia to discuss the "Delta Historical Project." Mr. Fordjour said in the electronic message that he understood that Ms. Boyd's approval was required. On information and belief, in December 2003, Mr. Fordjour met with Ms. Boyd to discuss some of the details of the proposed arrangement.

27.     In a letter dated February 27, 2004 to Ms. Boyd from Mr. Fordjour as "Artist," Mr. Fordjour proposed that Delta commission him to create an original painting of Delta's Founders and a "corresponding documentary film," both of which would be unveiled at Delta's National Convention to be held in July 2004. In his letter, Mr. Fordjour specified the assistance he expected from Delta, including: securing a room at Howard University for his screening of model; providing breakfast and a box lunch for 30 people; securing an exhibitor's booth for him for the 2004 Convention; publicizing the project online through mass electronic mail; posting an announcement on the website deltasigmatheta.com, which incidentally is not Delta's website.

28.     Mr. Fordjour included a timeline, which had a "model screening" deadline of March 27, 2004, and a letter for Ms. Boyd's signature in which she would announce the commissioning of Mr. Fordjour and state the following: "Delta is committed to provide all necessary resources in order to fully realize the artist's vision.  We encourage our members and friends to involve themselves in anyway possible at the artist's request."

29.     Mr. Fordjour transmitted his letter and attachments to Ms. Boyd through an electronic message to Ms. McKinney on March 2, 2004, which she transmitted to Ms. Boyd on the same day by electronic message.  In an electronic message response to Ms. McKinney, Ms. Boyd stated, "I think we need to see a draft concept of the portrait and the supporting documentation or something before I am willing to ask anyone to participate in this[.]"

30.     On information and belief, at some point after this and after a further exchange of electronic messages, the parties began negotiating the terms of a contract, but contract negotiations broke down over the terms of the contract in April 2004.

31.     Derek Fordjour first wrote Delta President Louise A. Rice about a partnership arrangement ten months into her term as President and only a "few weeks" before Derek & Jamar planned to launch its project.  He expressed his desire to "partner with" Delta to create a legacy of Delta's history by producing "a large-scale monumental painting of the Founders of Delta Sigma Theta and produce a 45 minute documentary film to accompany the painting."  In addition to proposing the forming of a partnership on the eve of launching the project, the letter misrepresented the facts and provided less than a full recitation of other facts.  For example, while Mr. Fordjour stated in the letter that, "the project was well received when it was proposed during Delta's previous administration," he neglected to state that in fact his negotiations with the Past President had broken down when the parties were unable to agree on the terms of a

10

contract.  Mr. Fordjour misrepresented that Paula Giddings, a Delta who is a renowned author and professor, was interested in participating in the project.  Ms. Giddings had no interest in participating in the project.

32.    On July 8, 2005, counsel for Delta wrote Craig T. Williams, a producer of the project and with whom counsel had corresponded and had a conversation, about misrepresentations made in an electronic message to a member of Delta.  Delta expressed interest in working with the producers of the project to ensure that the founding of Delta would be accurately portrayed and the rights to works about Delta would be properly credited.  Delta emphasized, however, that "any collaborative effort must be based on mutual respect of rights and time commitments, as well as accuracy in all communications, which includes full disclosure of important facts."  Mr. Williams responded to counsel by electronic message on July 8, 2005, apologizing for misrepresentations and stating that he only expressed his knowledge of the "situation" as conveyed to him by Derek Fordjour and that the project "is his project."  He also informed counsel to deal directly with Mr. Fordjour in the future.

33.    The President of Delta met with Mr. Fordjour and his team, which included his brother Isaac Fordjour and his legal counsel, on September 23, 2005 so that Mr. Fordjour could present his proposal.  The meeting was held at Delta's offices in Washington, District of Columbia.  Attending on behalf of Delta, in addition to Dr. Rice, were Delta's Executive Director, Roseline McKinney, and its legal counsel.  Derek Fordjour did most of the talking and distributed the proposal for the project, which consisted of a "Strategic Marketing Plan," a document that identified ten things defendant wanted from Delta in its "partnership" with Delta; Derek Fordjour's resume; a document entitled "Delta Historical Project November Meeting; and a letter dated September 23, 2005, which Mr. Fordjour proposed that Dr. Rice sign to

demonstrate her approval and endorsement of the project and to encourage members and friends to support it.

34.    The "Strategic Marketing Plan" made clear that defendant's primary motive in seeking a "partnership" with Delta was to gain access to its members.  The Plan would have required Delta to: 1)  send a letter to its members endorsing the project; 2) make the National President of Delta available for an appearance in the documentary; 3)  provide Derek & Jamar access to Delta's archives; 4) appoint staff from the "National Office" to serve as a liaison for the project; 5)  participate in any press releases and interviews; 6)  allow a link to the Black Sorority Project's website to be placed on Delta's homepage; 7)   provide direct mailing to Delta's membership marketing materials designed by the Black Sorority Project four times per year for two consecutive years; 8)  provide the Black Sorority Project advertising space in THE DELTA JOURNAL for eight consecutive editions; 9)   allow Derek & Jamar to unveil the project at the "most well attended event" at the National Convention and provide "complimentary premium" vendor space at Delta's National Convention in 2006 and all Regional Conferences in 2007 ( a total of seven); and 10)  agree to maintain "[Delta's] marketing networking for 24 months."  To be sure that Delta understood their request, the project leaders placed "free of charge" in parenthesis after "complimentary premium vendor space."

35.    Because the written documents distributed by Mr. Fordjour detailed what defendant wanted from Delta, but did not state at all how Delta would benefit from the project and left many other questions unanswered, Dr. Rice and Ms. McKinney had to probe Mr. Fordjour for the details.  Mr. Fordjour said there was flexibility with respect to the quality control aspect of the project, but he admitted on questioning that he already had held auditions for models for the painting and actresses for the film and had completed "the reenactment part of

the documentary." He also admitted that he wanted to "own the creative license." In addition, when asked how he would choose the historians who would serve as commentators, he responded that he knew who the scholars were in the field of history and sociology. Further, Mr. Fordjour said that he intended to create an open edition, offset lithograph of the painting, which he would package with the documentary DVD and sell to Plaintiff's membership for $125.00. As to the original painting itself, after a tour to selected cities, Mr. Fordjour would allow Delta to hang it in its headquarters until the painting was sold.

36.    Mr. Fordjour further explained that Delta would not have to commit to purchasing the painting. He described his targeted audience as members of Delta, although he believed the documentary would have broad market appeal, especially to educational institutions. At the conclusion of the meeting, Dr. Rice explained that Delta's Executive Board, its governing body, was scheduled to meet September 30, 2005 through October 2, 2005, and that she would present the proposal to the Board and convey the Board's decision following its meeting.

37.    Following the meeting between defendant and plaintiff, defendant sent a letter dated September 28, 2005 to "Executive Committee Members," with a copy to Dr. Rice, Delta's Executive Director, Ms. McKinney, and legal counsel. In the letter, defendant referenced the September 23, 2005 meeting and encouraged Committee Members to review a two minute DVD clip and a written overview of the project, which defendant included with its letter. In the written overview, defendant, described the "Target Audience" as "all members of the organization"; African American women with an interest in the history of organizations and the history of women's struggles; and graduate members of Delta who may not be financially active. Defendant reiterated the marketing assistance it wanted from Delta. Defendant, however, identified additional assistance it wanted from Delta. Specifically, it wanted Delta to

"prominently" announce and promote the project at all "Graduate chapter meetings nationwide," and it wanted "access (directly or indirectly) to the sorority's directory to submit a stand-alone mailing announcing the product/project." The request for access to Delta's directory was in addition to the request for direct mailings to the membership by Delta. The overview identified one potential benefit to Delta: stimulation of reclamation efforts.

38.    At its Board meeting, after careful consideration and review of the defendant's proposal, the Board voted unanimously not to support or endorse the project. The Board's decision was communicated by Delta's counsel to defendant's counsel in a letter dated October 11, 2005. In this letter, Delta's counsel requested that defendant refrain from in any way stating, suggesting, implying, or indicating that Delta or any of its Executive Board members in anyway endorse, support, sponsor, approve of, or is involved in The Black Sorority Project or anything related to it; . . . that the documentary affirmatively disclaim any approval, involvement, support, or endorsement by Delta; [and] [Derek & Jamar Productions] not use any of Delta's trademarks or copyrighted materials." Finally, counsel encouraged "Mr. Fordjour and others to refrain from misrepresenting the level of support of individual members, including prominent members such as Paula Giddings."

39.    Defendant proceeded with its project and, by its own admission, produced a large scale painting purporting to represent the Founders of Delta. It also produced a documentary entitled: "Black Sorority Project: The Exodus," which purports to document the founding of Delta. The cover design and the documentary itself deliberately seek to confuse members of Delta and the public at large by suggesting that Delta was involved in the making of the documentary. The DVD cover has on the front, "The Story of Delta Sigma Theta," and on the back: "Delta Sigma Theta -- 22 Women One Destiny," thus using Plaintiff's trademarked name.

In the documentary, Delta's trademarked name and symbols are used without Delta's permission. In particular, the documentary opens with Delta's registered Greek letter symbols ΔΣΘ flashing on the screen, there is a scene where Delta's Greek letter symbols are prominently displayed, and there is another scene where the words "Delta Sigma Theta" are displayed. Defendant used Plaintiff's trademarks with full knowledge of Plaintiff's limitations on and its requirements for use of its marks.

40.     There is no disclaimer printed anywhere on the DVD disc itself, its packaging, or its front or back cover. The following words appear at the end of the documentary: "The Black Sorority Project is an independent historical initiative and is in no way funded, supported, endorsed or promoted by the *present day organization Delta Sigma Theta Sorority, Inc.*"(emphasis added). This meager attempt (and incorrect information) by defendant seeking to disclaim any wrongdoing in the production and marketing of the DVD only confuses the viewers.

41.     Notwithstanding the Board's decision not to support or endorse the project, defendant has made a concerted effort to contact Delta's membership directly. One communication on May 31, 2006, an electronic message addressed to the Director of the Eastern Region of Delta, which has 147 chapters, describes the project and states "Before the general public is invited, we have made our self-registration online rsvp page available to Northeastern area chapter Presidents to forward to anyone interested." Defendant continued to try to reach members by various and many means, including openly posting information on its internet website announcing that there would be a screening of the film in Philadelphia, the site of Delta's 48th National Convention, during the time of the Convention, thereby intimating Delta's endorsement. Defendant's efforts to reach members caused concern, anxiety, and undue

questions among Delta's members, who began to inundate the Executive Director and the President with inquiries about Delta's seeming participation in the film, or questioning why Delta was not supporting it. Although Delta had posted its position on its website, it had to post new information and had to spend considerable time responding to individual inquiries. The need to consult internally about and respond to numerous individual inquiries resulted in countless hours of lost work time.

42.     On information and belief, defendant in fact did have a screening of the film in Philadelphia. Following the Convention, defendant sent a letter and DVD on August 11, 2006 to Dr. Rice, the President, Ms. McKinney, the Executive Director, and legal counsel asking that Delta reconsider a partnership. By letter dated August 25, 2006, Delta's counsel responded, stating that if Dr. Rice believed the Executive Board needed to revisit the issue of a business arrangement with defendant, she would present the matter to the Executive Board and convey the Board's decision through legal counsel.

43.     Ignoring the letter from legal counsel and earlier correspondence, and with full knowledge that Delta's Executive Board had voted not to support or endorse the project, defendant multiplied its efforts to penetrate Delta's membership and access the resources it had identified in its "Strategic Marketing Plan." During the summer of 2006, defendant sent a letter and a copy of the DVD to at least twenty seven (27) Executive Board members. The letter, in pertinent part, makes "a humble plea for [the Executive Board member recipient] to review the contents of this package and use your voice to help bring about a fruitful relationship between this project and Delta Sigma Theta Sorority, Inc." The Board members defendant contacted were the ones who deliberated on the request for support in 2005 and voted not to support the

project.  On information and belief, defendant sent a similar letter and made other contact with other members of Delta.

44.    In a further effort to access and incite Delta's membership, Derek Fordjour and Jamar White, appearing to act in their individual capacity as well as on behalf of defendant company, posted on defendant's website a list of what they characterize as "frequently asked questions" ("FAQs") along with their version of what the responses should be.  The responses contain numerous misrepresentations, omissions, and half truths, that when read against defendant's overall actions in this case and when read in the context of the entire document, were designed to harm the reputation of Delta and to incite contempt toward Delta and its leaders by Delta members and the public at large.  Among the misrepresentations are the following:

- **Misrepresentation:**  The FAQs state that the prior President of Delta, Gwendolyn E. Boyd, was "supportive" of the project.

  **Fact:**  Ms. Boyd stopped negotiating with Mr. Fordjour in early 2004 when the parties were unable to reach agreement over the terms of a contract, including the amount of royalty payment Delta would receive.

- **Misrepresentation:**  The FAQs state that Derek & Jamar attempted to contact the President, Dr. Rice, "over a period of several months," but was "unable to generate a response."

  **Fact:**  Mr. Fordjour first wrote Dr. Rice on May 12, 2005, eight into her term as President.  Counsel for Delta wrote to one of the Producer, Craig T. Williams, on July 8, 2005, less than two months after Mr. Fordjour's letter.  Counsel stated that Delta would be interested in working with the producers, but that any collaborative effort  must  be based on mutual respect of rights and time commitments, as well as accuracy in all communications, which includes full disclosure of  important facts.

- **Misrepresentation:**  The FAQs state that "politics prevented reason in this case," implying that the Executive Board, in deciding not to endorse or support the project made a decision based on "politics" and did not analyze the merits of endorsing or supporting the project.

**Fact:**  Although the Board had a right to deny the  request  for  support  without any discussion or analysis, it in fact did analyze the request     and     the     facts surrounding the request.

- **Misrepresentation:**  The FAQs state that "Obedience to leadership is a good thing.  Misinformation is not."  This implies that the President or other Delta leadership provided misinformation about the project.

  **Fact:**  This is an untrue statement.  In the statement posted on its website conveying the Board's decision (the only statement that had been posted on Delta's website at the time the FAQs were posted on defendant's website, Delta provided no information about the project, good or bad.

- **Misrepresentation:**  The FAQs state that there are vendors who mass-produced "distasteful" products that use Delta's symbols and "who do not seek permission to create their craft and often become approved vendors."

  **Fact:**  Delta has licensed hundreds of vendors over the years.  Before any license is granted, as defendant and Mr. Fordjour and Mr. White know because defendant has applied for a license, an  applicant  must  attest  that  it  understands  that  a license is required before anyone may manufacture, design, make, copy, sell, or distribute merchandise containing Delta's marks or symbols.  Delta is vigilant in pursuing vendors who use its intellectual property without having sought and obtained a license.  It has an  intellectual  property  specialist  who  even  attends trade shows and other venues to monitor appropriate use.  Any perpetrators are immediately demanded to cease and desist and requested to pay a fine.

- **Misrepresentation:**  The FAQs state that defendant planned "to donate the original [of the painting of the Founders] to National Headquarters.

  **Fact:**  Because the May 12, 2005 letter to the President and the "proposal" distributed to the President and the Executive Director at the September 23, 2005 did not address the issue of payment of royalties or ownership of the painting, they asked specifically about that and were told in no uncertain terms that the painting would be allowed to hang at Delta until there was a buyer, at which point Delta would have to release it.  There was never even a suggestion that it would be donated to Delta.

- **Misrepresentation:**  The FAQs also state that the project was not "funded, supported, endorsed or promoted by the present day organization Delta Sigma Theta Sorority, Inc."  This statement suggests that at some point some Delta "organization" has funded, supported, endorsed or promoted" the project.

  **Fact:**  There is only one organization of Delta.  Its governing body is an Executive Board.  In the history of Delta, no Executive Board has approved the project.

45.     The FAQs deliberately contain a number of self-serving half truths and innuendos that appear to have no other purpose than to defame the President and Delta, incite the membership, confuse the public, and embellish the project. For example, the FAQs state repeatedly that the Board made the decision not to support the project without having seen the project or the painting, suggesting to all internet website viewers (*i.e.,* the world) that the Board was not acting in the best interest of Delta and that a reasoned, responsible decision could only have been made by reviewing the project.  Nowhere does defendant state that it presented a skeletal proposal to Delta almost on the even of launching the project (*i.e.,* it did write the President of Delta about the project until eight months after she had begun her term, and that when the project leaders met with Delta to discuss the project, they admittedly were very far along in its production); that it offered Delta no creative rights or control of the project; and that the written "proposal" presented to Delta at the first meeting with Delta in September 2005 only identified ten things defendant wanted Delta to do to support the project, but did not address any manner in which Delta might benefit from the project.

46.     The FAQs also state that the project leaders remained silent and chose "not to issue a rebuttal" out of respect for Delta.  This suggests that Delta had made a statement about the project or the leaders that required a rebuttal. Nothing could be further from the truth.  As stated earlier, the only statement that Delta had posted on its website about the project at the time the FAQs were posted does not provide information about the project or he project leaders.  The statement simply informs members that the Board had voted not to support the project and asked Chapter Presidents not to take any action to suggest that Delta endorsed or supported the project. Aside from this statement, Delta made no statements about the project or the leaders.

47.     The FAQs state that the leaders have a "healthy respect for protocol and due process, which is why [they] followed it." This is another statement that is designed to appeal to the emotion of the reader and does not present the true facts. So that the reader (certainly any member of Delta) might judge whether the leaders had followed protocol, the FAQs should mention that Mr. Fordjour, having not presented a written proposal of a project until ten months into the President's term, and anxious about not having received an immediate response, called the President on her personal telephone line at her home, on a number that is not listed and that the general public does not have. The FAQs also should have mentioned that the written "proposal," in addition to being presented post-casting and into the production of the documentary, contained only details of how Delta's resources could be used and no timelines.

48.     The FAQs state that the project leaders are not trying to "get rich off Delta," stating that there "are much easier ways to seek fortune." For readers to be able to judge the accuracy of this statement and determine for themselves whether the leaders were seeking to use Delta as a money making vehicle, the project leaders should not have purposefully omitted facts known to them. For example, the members or any reader should have been told that the implementation of the project leaders'  "Strategic Marketing Plan" would require Delta's resources to be heavily impacted, as identified in Paragraph 33 of this Complaint.

49.     The FAQs ask the readers to "Think for a moment about the last time you walked into a fine arts museum among the historical paintings and saw African-American women who weren't serving, cooking, singing, dancing, eroticized or bound in submission. . . . We're proud to have created an historical image of black women at the turn of the century engaged in a monumental, collaborative, socio-political, intellectual endeavor." This statement is another one using emotional verbiage to suggest facts for which there is no evidence. By raising the question

of what African American art exists in museums, the project leaders suggest that their piece will or might hang in a museum. Yet they present no proof of that. On information and belief, there is no museum that has agreed to display the painting. Anyone remotely familiar with African American art knows that scores of works have been created showing women in positions other than those identified by the project leaders. So, their painting is not the only painting about African American women that depict them in lofty endeavors.

50.     On information and belief, the FAQs were posted in August 2006 and remain posted to this day.

51.     Delta requested that defendant remove the FAQs, post a statement acknowledging that the FAQs contain untrue statements, post a factually correct disclaimer, and send a letter of apology to the President. Defendant refused to cease is propagation of falsehoods, thereby continuing to publish to the public at large statements it knows to be untrue and continues to injure and defame Plaintiff.

52.     On information and belief, the website on which the FAQs are posted is maintained and operated outside the District of Columbia – in the State of New York.

53.     The website on which the FAQs are posted is an interactive website that is accessible in the District of Columbia and allows browsers, including residents of the District of Columbia, to interact directly with the website on some level. Defendant has offered the painting and DVD for sale through the website, has solicited comments on the documentary through the website, and, on information and belief, has received comments on the project through the website. Defendant thus has purposefully directed its activities at District of Columbia residents.

54.     Further on its website "news" link, defendant has posted "the Crimson Review" (crimson and cream are the official colors of Delta) offering "Promotional Copies [of the DVD] for Delta Chapters to Review," explaining that "the Crimson Review is designed solely to raise awareness among chapters interested in Black Sorority Project: The Exodus." This offer is purposefully being directed to residents of the District of Columbia as well as those of other states.

55.     On information and belief, on November 17, 2006, defendant held a viewing of the film in Washington, District of Columbia, which several hundred persons attended. The documentary shown contains at the end essentially the same misleading disclaimer that appears on defendant's FAQs posted on its website.

56.     On information and belief, at the conclusion of the showing, defendant offered for sale and did sell DVDs and copies of the painting to members of the viewing audience.

## COUNT I
## FEDERAL COMMON LAW TRADEMARK INFRINGEMENT

57.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 56 above, as though fully set forth herein.

58.     Plaintiff owns valid trademarks for its name, marks, and logos (collectively "marks"), including the name "Delta Sigma Theta."

59.     Plaintiff's marks are distinctive, and highly suggestive of its place in history as the preeminent African-American collegiate women's public service organization, established in 1913.

60.     Plaintiff's marks are well-known, not only to the thousands of women who have become members, but are nationally and internationally recognized in commerce by educational institutions, by national and local elected officials, by corporate entities, and by the public at

large through Plaintiff's extensive educational, health, social advocacy, and cultural outreach programs, for which it has received national recognition from numerous government officials, including several Presidents and First Ladies of the United States.

61.    Defendant's unauthorized use of Plaintiff's name, marks, and logos and trade dress are designed to exploit plaintiff's marks, trade dress, and goodwill so as to bolster the credibility of defendant's commercial enterprise. Defendant's commercial enterprise includes the sale of a painting purporting to represent the Founders of Delta and the distribution and sale of a DVD documentary entitled: "Black Sorority Project: The Exodus." The DVD physically incorporates Delta's name on the front and back DVD cover and uses marks and logos, including Plaintiff's name and symbols, within the documentary.

62.    On information and belief, defendant used Plaintiff's mark and trade dress in interstate commerce, specifically, in a screening of the documentary in Philadelphia and in showing the documentary in various cities, including in the District of Columbia on November 17, 2006.

63.    The association of defendant's DVD documentary with Plaintiff's non-profit work is causing and is likely to continue to create confusion as to any connection or affiliation between Plaintiff and defendant, or endorsement by Delta of defendant's products, as is plainly evident in the Black Sorority Project's FAQs page, in which the connection, affiliation, or endorsement are frequently questioned.

64.    By using Plaintiff's marks and its distinctive trade dress on its DVD package and within the DVD documentary, defendant has falsely designated, described, represented, and advertised the Black Sorority Project. Specifically, it has falsely represented or implied that the

Black Sorority Project originated from or was connected with or approved by Plaintiff at a previous point in time.

65.    Plaintiff has been damaged, and believes it is continuing to be damaged, by defendant's use of Plaintiff's marks and its distinctive trade dress.

66.    Defendant's unauthorized use of Plaintiff's marks and trade dress is causing and is likely to continue to cause confusion, mistake, or deception, as to the course, sponsorship, or approval of defendant's products, in violation of federal common law trademark law..    The public or some not insignificant portion thereof is likely to believe that the "Black Sorority Project: The Exodus" is connected with, authorized by, or related to Plaintiff.

67.    By virtue of the aforementioned acts of defendant, Delta has suffered and will continue to suffer damages and irreparable harm unless defendant is restrained by this Court; wherefore, Plaintiff is without an adequate remedy at law.

## COUNT II
## DISTRICT OF COLUMBIA COMMON LAW TRADEMARK INFRINGEMENT

68.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 67 above, as though fully set forth herein.

69.    Plaintiff owns a valid trademark for its name, marks, and logos (collectively "marks"), including the name "Delta Sigma Theta."

70.    Plaintiff's mark is distinctive, and highly suggestive of its place in history as the preeminent African-American collegiate women's public service organization established in 1913.

71.    Plaintiff's marks is well-known, not only to the thousands of women who have become members, but are nationally and internationally recognized in commerce, by educational institutions, by national and local elected officials, by corporate entities, and by the public at

large through Plaintiff's extensive educational, health, social advocacy, and cultural outreach programs, for which it has received national recognition from numerous government officials, including several Presidents and First Ladies of the United States.

72.    Defendant made unauthorized use of Plaintiff's name, marks, and logos and trade dress. Defendant's uses of Plaintiff's marks and trade dress are designed to exploit Plaintiff's marks, trade dress, and goodwill so as to bolster the credibility of defendant's commercial enterprise. Defendant's commercial enterprise includes the sale of a painting purporting to represent the Founders of Delta and the distribution and sale of a DVD documentary entitled: "Black Sorority Project: The Exodus." The DVD physically incorporates Delta's name on the front and back DVD cover and uses marks and logos, including its name and symbols, within the documentary.

73.    The association of the painting and the DVD documentary is causing and is likely to continue to create confusion as to any connection or affiliation between Plaintiff and defendant, or endorsement by Plaintiff of defendant's products, as is plainly evident in the Black Sorority Project's FAQs page, in which the connection, affiliation, or endorsement are frequently questioned.

74.    By using Plaintiff's marks and its distinctive trade dress on its DVD package and within the DVD documentary, defendant has falsely designated, described, represented, and advertised the Black Sorority Project. Specifically, it has falsely represented or implied that the Black Sorority Project originated from or was connected with or approved by Plaintiff at a previous point in time.

75.    Plaintiff has been damaged, and believes it is continuing to be damaged, by the defendant's use of Plaintiff's mark and its distinctive trade dress.

76.     Defendant's unauthorized use of Plaintiff's marks and trade dress on its products, including the documentary DVD entitled "Black Sorority Project: The Exodus" and its cover is likely to cause confusion, mistake, or deception, as to the course, sponsorship, or approval of defendant's products, in violation of District of Columbia common law.  The public or some not insignificant portion thereof is likely to believe that the "Black Sorority Project: The Exodus" is connected with, authorized by, or related to Plaintiff.

77.     Defendant's unauthorized use of Plaintiff's marks and trade dress on its products dilutes the distinctive quality of Plaintiff's mark and trade dress.

78.     By virtue of the aforementioned acts of defendant, Delta has suffered and will continue to suffer damages and irreparable harm unless defendant is restrained by this Court; wherefore, Plaintiff is without an adequate remedy at law.

### COUNT III
### INJURIOUS FALSEHOOD

79.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 78 above, as though fully set forth herein.

80.     Defendant published false and derogatory statements concerning Delta on defendant's website, as described above, to third persons with the intent of injuring the President and Delta and inciting Delta membership and supporters and ultimately to induce the membership and supporters to pressure the President and the Delta board to endorse the Defendant's project.

81.     Defendant's false and derogatory statements impeached the integrity and business methods of the President and Delta and, on information and belief, materially and substantially induced the Delta membership and the public to be confused about the nature of Delta, its governance and its business practices.

82.    On information and belief, defendant's false and derogatory statements to third persons diminished Delta's standing among its members and supporters, all of whom Delta relies upon to carry out its operations in the public service field, which constitutes the Plaintiff's business practices. Without the full support of its members and other supporters, Delta would be unable to operate its business.

83.    Defendant's false and derogatory statements have caused Plaintiff to suffer monetary damages of at least $75,000 and in a further amount to be determined at trial.

## COUNT IV
## MISAPPROPRIATION OF A TRADE SECRET

84.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 83 above, as though fully set forth herein.

85.    Plaintiff possesses a trade secret in the form of its closely-guarded membership list, which includes the names and contact information of members. Plaintiff undertakes extraordinary measures to protect the list. The list is not even shared with all members of Delta or with Delta's foundation. As a result of such extraordinary measures to protect its list, Delta the list is not generally known to anyone but a select few individuals and is not readily obtainable by proper means. It would be virtually impossible to recreate the information contained on the membership list if such information were not obtained impermissibly.

86.    As stated above, the membership list is of extraordinary value to Delta, and it would be extremely valuable in the hands of others, particularly to defendant who has created a product for which the Delta members represent virtually the entire potential customer base. In an overview of the project, defendant described his target audience as "all members of the organization" and sought "access (directly or indirectly) to the sorority's directory to submit a

stand-alone mailing announcing the product/project." Delta never provided defendant access to its mailing list.

87.    Delta members joined Delta because of its good work and its reputation, developed over nearly a century of performing outstanding, nationally-recognized public service and making concerted efforts to build and protect its great reputation and goodwill. As a result, only through extraordinary hard work has the membership of Delta and thus the membership list been developed. Delta has written policies precluding the dissemination or sharing of its membership lists.

88.    On information and belief, defendant has obtained Delta's membership list in an impermissible manner, given that Delta does not disclose its membership list. Further, on information and belief, defendant obtained the list with knowledge of its value and that it was improper for defendant to obtain and make use of the list.

89.    Defendant's misappropriation of Plaintiff's trade secret has caused Plaintiff to suffer monetary damages of at least $75,000 and in a further amount to be determined at trial.

## COUNT V
## DEFAMATION

90.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 89 above, as though fully set forth herein.

91.    Defendant stated in its FAQs, among other false statements, that the President and leadership of Delta provided misinformation to the membership of Delta about defendant's project and that Delta approves and grants licenses to vendors who mass produce products with "blatant and often distasteful use" of Delta's symbols and marks without having sought permission to use the marks or symbols.

92.     Defendant's statement that Plaintiff provided misinformation about it or its project is false, and essentially charged that Plaintiff is unscrupulous, dishonest, and unworthy of confidence and imputed to Plaintiff conduct and characteristics incompatible with the proper exercise of its lawful business.

93.     Defendant's statement that Plaintiff licenses and approves vendors who mass produce "distasteful" products using Delta's trademarked symbols and marks without seeking permission to use the marks or symbols is false and imputes to Plaintiff conduct and characteristics incompatible with valuing its intellectual property and also conveys an incorrect message to the public that Plaintiff does not have in place policies and procedures for seeking and obtaining licenses to use Plaintiff's trademarked names, marks and symbols.

94.     Defendant's published its false and defamatory statements without privilege to third parties.

95.     Defendant's statements were intended to and did defame Delta and injure Delta in its trade and its community standing and lower its standing in the public's estimation.

96.     Defendant knew its statements were false and would defame Plaintiff, but acted with malice -- in reckless disregard of knowing the statements were false.   Alternatively, defendant negligently failed to ascertain whether its statement that defamed Plaintiff were false.

97.     Defendant's false and defamatory statements are actionable as a matter of law in that they tended to disparage Delta in the conduct of its business and in the discharge of its responsibilities to its members and as a highly regarded not-for-profit organization.

98.     Defendant's false and defamatory statements have caused Plaintiff to suffer monetary damages of at least $75,000 and in a further amount to be determined at trial.

WHEREFORE, Plaintiff prays that this Court:

1.    Issue a permanent injunction enjoining defendant, its agents, servant, employees, representatives, and assigns, and all persons acting in concert or participation with it from the following acts:

(a)    Producing any products, projects, or merchandise wherein it uses, displays, exhibits, or otherwise employs Delta's trademarks, including its name, logos, or symbols.

(b)    Doing or failing to do any act or thing calculated to or likely to induce the belief that defendant or any of its products or projects are connected with or approved or endorsed by Delta.

(c)    Using a "disclaimer" that suggests or implies that any administration or governing body of Delta has at any time approved, endorsed, supported or funded any products, merchandise or projects produced by defendant.

(d)    Making any statements that charge that Plaintiff is unscrupulous or dishonest, or devalues it trademarks, and imputes characteristics and conduct to Delta that are incompatible with the proper exercise of Plaintiff's lawful business and that injures Plaintiff in its trade and in its community standing.

(e)    Using Plaintiff's lawful trade secrets to contact Plaintiff's members.

2.    Order defendant to post on its website a statement acknowledging the falsity of all false statements and prominently display on its website a corrected disclaimer.

3.    Order defendant to remove the misleading disclaimer from its documentary and include a factually correct disclaimer, stating that its project is not in any way connected with and has not been funded, approved, endorsed, or otherwise supported by Delta Sigma Theta Sorority, Incorporated.

4.    Order defendant to account for all profits it derived as a result of its infringement of Plaintiff's trademarks, and enter judgment against defendant for such profits, together with punitive and exemplary damages.

5.      Enter judgment against defendant for injury suffered by Plaintiff as a result of defendant's statements defaming Plaintiff, together with punitive and exemplary damages.

6.      Enter judgment against defendant for injury suffered by Plaintiff as a result of defendant's publication of injurious falsehoods about Plaintiff, together with punitive and exemplary damages.

7.      Enter judgment against defendant for injury suffered by Plaintiff for misappropriating Plaintiff's trade secret, together with punitive and exemplary damages;

8.      Enter judgment against defendant for Plaintiff's legal expenses, costs, and reasonable attorneys' fees incurred in connection with this action.

9.      Grant such other relief as this Court deems just and proper.


Respectfully Submitted,

Devarieste Curry, # 384621
Marc Miller, 948372
McLeod, Watkinson & Miller
One Massachusetts Avenue
Suite 800
Washington, D.C. 20001-0014

202-842-2345
202-408-7763 (facsimile)
dcurry@mwmlaw.com
mmiller@mwmlaw.com

Dated:  November 21, 2006

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Delta Sigma Theta Sorority, Inc. | Derek & Jamar Productions, LLC |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)    88888
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Devarieste Curry
McLeod, Watkins & Miller
One Massachusetts Avenue, NW, Suite 800
Washington, DC 20001
(202)842-2345

ATTORNEYS (IF KNOWN)

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government Defendant

◉ 4 Diversity
(Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ◉ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ◉ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A.** *Antitrust*

☐ 410 Antitrust

○ **B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

**Any nature of suit from any category may be selected for this category of case assignment.**

***If Antitrust, then A governs)***

---

◉ **E.** *General Civil (Other)*    **OR**    ○ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☒ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. 1332(a)(1)  Federal Trademark Infringement and Pendant State Claim

| VII. REQUESTED IN COMPLAINT | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ 75,000 Plus | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND: | YES ☐  NO ☒ |

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  November 21, 2006    SIGNATURE OF ATTORNEY OF RECORD  *Devanesta Curry*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.