UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DELTA SIGMA THETA SORORITY, INC.   *
    Plaintiff,   *
         *
v.   *   CASE NO. 1:06CV01993
      (RMC)
         *
DEREK & JAMAR PRODUCTIONS, LLC   *
    Defendant.   *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEREK & JAMAR PRODUCTION, LLC'S
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
UNDER FED. R. CIV. P. 12(b)(6)**

PURSUANT TO Fed. R. Civ. P. 12(b)(6) Defendant Derek&Jamar Productions, LLC (hereinafter "D&J), by undersigned counsel, respectfully move to dismiss the Complaint for failure to state a claim on which relief can be granted.

**INTRODUCTION**

Jamar White, a graduate of Pratt Institute School of Art and Design, and Derek Fordjour a graduate of Morehouse College and Harvard University had a dream: They wished to use their creative talents as fine and graphic artists to tell untold stories through classical art and multimedia formats. They first learned this was possible when they worked together informally on a project entitled "An Experiment in Brotherhood", a painting and short thirty minute documentary set in the year 1906 describing the founding of their own fraternity, Alpha Phi Alpha. It was so well received within the ranks of their own brotherhood that they were

encouraged to investigate the history of the fellow black Greek-lettered organizations.  They formed Derek & Jamar Productions, LLC (hereinafter "D&J) to facilitate this.

After learning of the participation of Delta Sigma Theta Sorority, Inc. (hereinafter "Delta")'s founders in the Women's Suffrage March of 1913, D&J decided to on the next project: D&J would tell the story of Delta Sigma Theta (hereinafter "Delta")--one of the most prestigious and famous African-American sororities.  This project would have two component parts:  a monumental painting depicting Delta's 22 founding members and a short movie on DVD.  The painting would use  photographs and other historically factual information to depict Delta's founders.   The short movie was planned to last about 45 minutes and would re-enact the events surrounding the founding of Delta and setting out Delta's idealistic principles, goals and desires.

D&J was prepared to do this entirely on its own, but wished to obtain the cooperation of Delta.  Specifically, D&J wished to obtain access to Delta's archives (to ensure historical accuracy) and wished to be able to market to Delta's membership by telling them that the project had Delta's imprimatur.[1]  Sadly, Delta declined to endorse the project.

---

[1]     It is worth noting that several famous African-American historians are members of Delta and, without Delta's imprimatur they declined to assist D&J.

Despite this decision by Delta, D&J went ahead with the project, yclept the "Black Sorority Project". Upon completion, and despite the decision by Delta's Executive Board not to support the project, D&J began to market the DVD and accompanying print of the painting. They also scheduled screenings of the movie for interested parties. These efforts were successful and Delta's membership began questioning the Executive Director and President about the project and Delta's decision not to support it. It was at that point that Delta's leadership became upset with D&J for their acts of *lése majeste*.[2] This lawsuit is the result.

## THE COMPLAINT

The Complaint has 5 Counts: Federal and District of Columbia commonlaw Trademark Infringement, "Injurious Falsehood", Misappropriation of a Trade Secret and Defamation. In essence, these 5 Counts can be boiled down to:

Counts I and II (commonlaw trademark infringement):

1. D&J put the full name of Delta on the front and back of the DVD and its cover;

2. D&J used the full name of Delta in the 45 minute movie about the founding of Delta;

3. D&J used the Greek symbols for Delta in the 45 minute movie;

---

[2] An uncharitable person might think that other reasons why Delta refused to deal with D&J and brought this lawsuit are that Mr. Fordjour "admitted that he wanted to 'own the creative license'" to his own work, Complaint at ¶35, and that D&J would not pay Delta the royalty Delta demanded. Complaint at ¶44 (the first alleged "Misrepresentation" and "Fact").

and

    4.    D&J used Delta's full name in advertising public screenings of the 45 minute movie.

Count III (Injurious Falsehood) and Count V (Defamation)

    1.    Delta objects to the "FAQ's" on D&J's website contending that the FAQs contain "misrepresentations" that confused the membership and challenged the integrity and methods of Delta's Executive Board.[3]

    2.    Delta objects to statements about quality of products endorsed and whether or not Delta trademarks are used without permission.[4]

Count IV (misappropriation of trade secrets)

    1.    D&J wrote to Delta's members without permission.[5]

    2.    D&J posted information on the website[6]

As shown below, none of Delta's plaints rise to a level which forms the basis of any claim.

---

[3] Complaint ¶44. *See* below for a detailed discussion of ¶44's allegations.

[4] Complaint ¶¶44, 45, 80 and 91.

[5] Complaint ¶43 alleges D&J wrote 27 members of Delta's Executive Board and Complaint ¶41 alleged that D&J wrote Delta's Director of its Eastern Region. The names and contact information for all these people is publicly available information which can be found on various websites. *See* Exhibit 1.

[6] Complaint ¶41.

## ARGUMENT

**As this Court has recognized, pleading requirements in civil cases are not especially onerous**.

Usually it is not hard to survive a Motion to Dismiss for Failure to State a Claim. After all,

> [a] Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003); *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed.2d 80 (1957)). "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47-48, 78 S. Ct. 99 (internal quotation marks omitted). It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 51 1-14, 122 S. Ct. 992, 152 L. Ed.2d 1 (2002), or "plead law or match facts to every element of a legal theory," *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).
>
> Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Warren v. Dist. of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); Kingman Park, 348 F.3d at 1040. Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations-including mixed questions of law and fact-as true and draw all reasonable inferences therefrom in the plaintiffs favor. *Macharia v. United States*, 334 F.3d 61,64, 67 (D.C. Cir. 2003); *Holy Land Found. For Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003); *Browning*,

> 292 F.3d at 242. *While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations*. *Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.

*DePippo v. Chertoff,* 453 F. Supp. 2d 30, 32-33(D.D.C. Sept. 20, 2006) (emphasis added).

Here, however, as set forth below, the Plaintiff's Complaint cannot even clear the low hurdle set by Federal Rules of Civil Procedure 12(b)(6).

### The allegations in Counts I and II (common law Trademark Infringement) do not amount to a violation of the law.

The Lanham Act establishes the elements of trademark infringement. To establish infringement, a mark holder must show that the accused infringer has used the mark in commerce, and that "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Thus, a great deal depends on whether the public is likely to be deceived or confused by any similarity between Delta's mark and the Black Sorority Project's use of Delta's name and symbols.[7]

Courts, however, are careful to balance the First Amendment rights of

---

[7] Resolving a split among federal circuit courts of appeal on the elements of the "fair-use" defense to a claim of trademark infringement, the US Supreme Court has held, in *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 125 S. Ct. 542 (2005), that possible consumer confusion between a plaintiff's mark and an infringement defendant's mark does not foreclose application of the fair-use defense. Consequentially, an accused trademark infringer asserting the affirmative defense of fair use does not have to prove the absence of a likelihood of confusion.

freedom of expression and the intellectual property owner's rights in a mark.

In this case, D&J's Black Sorority Project is the story of Delta and a copy of a painting of the 22 women who founded Delta. There is no possible way the Black Sorority Project can be done without making reference to Delta. The facts alleged by Delta themselves show how little D&J used the trademark: on the front and back covers of the DVD and briefly within the movie. Complaint at ¶¶39, 61 and 72. Thus, there is no violation of Delta's trademarks because Delta's name and symbols are being used fairly and in good faith only to describe the Black Sorority Project.[8]

Furthermore, Delta's 2 counts of Trademark Infringement makes this case on all fours with *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302 (9th Cir. 1992), where USA Today and another newspaper conducted a public opinion poll in which readers were asked to choose their favorite music group among five choices, including the group "New Kids on the Block". The group sued, alleging unauthorized commercial use of their trademarked name. The Ninth Circuit, however, found the newspapers' use of the group's name to be a permissible nominative fair use on the basis of the following tripartite test:

---

[8] The substance of the painting and movie on DVD are irrelevant for purposes of this analysis as the First Amendment protects all commentary, even critical commentary when there is no confusion as to source. *See The Taubman Company v. Webfeats*, 319 F.3d 770, 778 (6th Cir. 2003) (holding that an Internet domain registrant's use of the plaintiff-shopping mall owner's mark in the domain name "taubmansucks.com" was purely an exhibition of Free Speech, and thus not subject to scrutiny under the Lanham Act).

    (1)    the product or service must not be readily identifiable without use of the trademark;

    (2)    only so much of the mark may be used as is reasonably necessary to identify the product or service; and

    (3)    the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

This test was applied in *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, 2001 U.S. Dist. LEXIS 8896 at *15-17 (N.D. Ill. 2001) (holding that because defendant Cigarettes Cheaper!'s sold cigarettes bearing Reynolds' trademarks, that fact could suggest Reynolds' sponsorship, endorsement, or approval, or affiliation with, those cigarettes and thus the use of those marks was not nominative fair use of the marks) *and Pebble Beach Co. v. Tour 18 I, Ltd.*, 155 F.3d 526 (1998)(holding that it is not nominative fair use to identify copies of golf holes by the trademarked names of the original holes).

Clearly, a painting of the 22 women who founded Delta and a movie discussing and (to some extent) re-enacting the founding of Delta, cannot be made without *some* reference to the subject. Delta is apparently contending that, somehow, D&J are doing something which implies sponsorship or endorsement by Delta. But this is contradicted by ¶41 of the Complaint which complains that Delta had to respond to questions about "why Delta was not supporting" D&J's project. Nowhere, in fact, does Delta suggest that D&J is doing anything to suggest that Delta is sponsoring or endorsing the Black Sorority Project.

Nor does scheduling a showing of the movie in Philadelphia at the same time as Delta was holding it's annual Convention in Philadelphia suggest Delta's official support or endorsement. The Black Sorority Project was designed to appeal to Delta members--when else would the membership be gathered in one place where D&J could showcase the Black Sorority Project and Delta's story as they envisioned it.

Thus, D&J's Black Sorority Project is on all fours with *New Kids on the Block* and is a permissible use of Delta's marks.

> **The statements on D&J's website, www.BlackSororityProject.com do not amount to either Injurious Falsehood or Defamation.**

A.   Injurious Falsehood is functionally the same as Defamation in this case.

> Injurious falsehood is also known as "disparagement of property," "slander of goods," and "trade libel." The tort ... protects against false statements that disparage the plaintiff's interest in, or the quality of the plaintiff's land, chattels, or intangibles.

*Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155n.6 (D.C. Cir. 1985).

To state a claim, the plaintiff must allege pecuniary harm resulting from the defendant's unprivileged publication of false statements, with knowledge or reckless disregard of the falsity, concerning the plaintiff's property or product. *Id.* at 155; *Golden Palace, Inc. v. National Broadcasting Co.*, 386 F. Supp. 107, 109 (D.D.C. 1974), *aff'd without opinion*, 530 F.2d 1094 (D.C. Cir. 1976); *System Operations, Inc. v. Scientific*

*Games Development Corp.*, 555 F.2d 1131, 1141 (3d Cir. 1977).

Although distinctions exist at common law between actions for injurious falsehood and defamation, the torts have always been very closely related. *Art Metal-U.S.A.,* 753 F.2d at 1155-56, *citing Acoustical Manufacturing Co. v. Audio Times, Inc.*, 3 Media L. Rep. 2057, 2064 (D.C. Super. Ct. 1977) ("The cause of action based upon 'injurious falsehood' is closely related to traditional defamation."). The primary difference between the two torts is requirement of pecuniary harm for injurious falsehood.  But where a corporation, such as Delta, brings an action for injurious falsehood, even this distinction is a nullity as a corporation suing for defamation, may only recover actual damages in the form of lost profits. *Id. and Martin Marietta Corp. v. Evening Star Newspaper Co.,* 417 F. Supp. 947, 955 (D.D.C. 1976).   Thus, Delta's claim for Injurious Falsehood is the same as its claim for Defamation and may be addressed (and dismissed) at the same time.

    B.    Plaintiff's detailed objections to the FAQs on www.BlackSororityProject.com  fail to demonstrate that the statements are defamatory.

Just because Delta's Executive Board does not like what D&J say in the FAQs on www.BlackSororityProject.com does not make the statements defamatory. After all, although "[a] statement is 'defamatory' if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990) (citations omitted)

more is required. Specifically, "an allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Clawson v. St. Louis Post-Dispatch, LLC, et al.*, .906 A.2d 308; 313 *quoting Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984) (citation omitted). *See also Guilford Transp. Indus., Inc. v. Wilner,* 760 A.2d 580, 594 (D.C. 2000).

> [N]ot every uncomplimentary publication is libelous. "An allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous or ridiculous'."

*Johnson v. Johnson Pub. Co.*, 271 A.2d 696, 697 (D.C. 1970) (citations omitted).

The distinction is simple: a defamatory statement must necessarily involve the idea of disgraceful behavior and a stain upon Plaintiff's character. *Guilford Transportation Industries, Inc. et al. v. Wilner* 760 A.2d 580,594 (D.C. App. 2000)(holding that defamation "necessarily, however, involves the idea of disgrace; ... [and a reflection] upon his character"). "***Words which do not disparage a plaintiff's character*** are not actionable, even if special damages flow from their publication." *Knight v. Blackford*, 3 Mackey (14 D.C.) 177, 182-83 (Supreme Ct. D.C. 1877)(emphasis added).

So it is important to look at the words used and what they mean. But

> [t]he court should not, however, indulge far-fetched interpretations of the challenged publication. The statements at issue should not be "interpreted by extremes, but should be construed as the average or common mind would naturally understand [them]."

*Guilford Transportation Industries, Inc. et al. v. Wilner* 760 A.2d 580 594 (citations omitted).  *See Chapin v. Knight-Ridder*, 993 F.2d 1087, 1092-93 (4th Cir. 1993)(The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference.).  *See also White v. Fraternal Order of Police,* 909 F.2d 512, 520 (D.C. Cir. 1990); *Dodds v. American Broad. Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998) (holding that plaintiff in defamation-by-implication case must show that the defendant intended to convey the defamatory impression); *Howard v. Antilla,* 191 F.R.D. 39, 44 (D.N.H. 1999) (same); *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 495 N.W.2d 392, 395-96 (Mich. Ct. App. 1992) (same); *see also, Moore v. Sun Publ'g Corp.*, 881 P.2d 735, 741-42 (N.M. Ct. App. 1994) (applying heightened standard for defamation by implication although the plaintiff was not a public figure and the subject matter of the suit was not of general public interest).

       1.       The context and implications of D&J's actions are a persistent attempt to obtain Delta's approval.

With this understanding, what is the context of Delta's specific complaints?  Reading just from what Delta has provided in the Complaint, it is clear that D&J

- first approached Delta almost 4 years ago, in May 2003.  Complaint ¶26;

- Asked for Delta's approval of the ideas.  *Id.;*

- Asked for Delta's assistance in
    - obtaining a room at Howard University where he would try to find models for the painting.  *Id.* at ¶27;
    - food for the people (models).  *Id.;*
    - an Exhibitor's booth at the 2004 Convention so the painting could be shown to Delta's.  *Id.* and
    - publicizing D&J's efforts.  *Id.*;

- attempted to negotiate a contract with Delta (the negotiations failed).  *Id.* at ¶30;

- tried a 2nd time to create a "partnership arrangement" with Delta in the Spring of 2005.  *Id.* at ¶31;

- Met again with Delta in September 2005 to present the proposal again;

> *Id.* at ¶33 and asked Delta to provide
> - help publicizing the project; *id.* at ¶34;
> - let Delta's President appear in the movie; *id.;*
> - access to Delta's archives; *id.* and
> - did not wish any other financial support from Delta or even a commitment to purchase the painting. *Id.* at ¶36;

- repeatedly described their target market as "'all members of the organization (Delta)' and other interested African American women". *Id.* at ¶37;

- tried a 3rd time to obtain Delta's approval by writing again in August, 2006. *Id.* at ¶42; and finally

- tried a 4th time to obtain Delta's approval by writing directly to 27 individual members of Delta's Executive Board making "a humble plea for [the recipient] to review the contents of this package and use your voice to help bring about a fruitful relationship between this project and [Delta]" *Id.* at ¶43.

These facts clearly demonstrate two things: a) D&J is very persistent and does not accept rejection and b) D&J desperately wishes to win Delta's approval. This, in fact, is the context for the FAQ's on www.BlackSororityProject.com and for all of D&J's other actions.

> 2. Within this context, Delta's specific complaints of misrepresentation, falsehood and/or defamation are overblown at best.

The Complaint ¶40 objects to the use of the phrase "present day organization" in the disclaimer and suggests, in ¶44, that this implies that at some point in the past Delta did support the project. But a more contextual reading of the disclaimer would indicate that D&J is still, despite everything, hoping to win Delta's approval

for the project at some point in the future.[9]  Under this contextualized interpretation, there is nothing false or even misleading about what is said and it is not defamatory in any way.

The Complaint ¶44 contains a litany of "misrepresentations" and "facts" which Delta claims add up to defamation.  The first "misrepresentation" cited in ¶44 raises the question of whether former Delta President Boyd was "supportive" of D&J's project as the FAQ states.  Delta claims that is a misrepresentation because contract negotiations failed--at least in part over how much money Delta would receive.[10]  But President Boyd would not have contemplated entering into negotiations with D&J if she did not support the project somewhat.  Or is Delta suggesting that former President Boyd would enter into negotiations to support a project she did not support?

The second "misrepresentation" mentioned in ¶44 is that an FAQ states that D&J attempted to contact Delta's President "over a period of several months" but could not get a response.  Delta says that this misrepresentation is proved by citing a

---

[9]  Another possible interpretation is that D&J was trying to distinguish the present-day Delta from the Delta depicted in D&J's project.

[10]  One wonders if Delta really intended to suggest that, if the royalty were high enough all of these problems would not have occurred.  The obvious implication being that, if the royalty is high enough Delta would endorse almost anything and validating D&J's comments about some "distasteful" products.  *See* discussion *infra* pp. 18-19 and fn. 12.

July, 2005, letter written by counsel. But this letter was written to Mr. Craig Williams, "a producer of the project ... about misrepresentations made in an electronic message to a member of Delta." Complaint at ¶32. But Mr. Williams is not part of D&J, something Delta should have mentioned in its Complaint, especially given its stress on "accuracy in all communications, which includes full disclosure of all important facts." *Id.* Delta knew that Mr. Williams was not part of the project, that the project was that of D&J. *Id.* So, Delta has admitted that it took until September before D&J could get a meeting with Delta to discuss the Project, *id.* at ¶33, and that this meeting was Delta's response to D&J's May, 2005, letter to Delta's President.[11] This certainly seems like a period of several months.

The third "misrepresentation" mentioned in ¶44 is that an FAQ blames "politics" for D&J's failure to obtain Delta's support. Delta then states that this implies that it did not analyze the merits of the project. As set forth above, when claiming that an implication is defamatory, Delta must demonstrate that the implication or innuendo is both unreasonable and defamatory. *Guilford,* 760 A.2d at 594. Delta must also demonstrate that D&J intended the defamatory implication. *Chapin,* 993 F.2d 1092-93. But a suggestion that D&J believes non-analytical factors dominated the decision (politics) is clearly protected opinion and is neither pejorative nor defamatory. And, given the context of D&J's actions set out above

---

[11] We can pass over, for now, whether a letter couched in the terms described in ¶44 is actually a "response" to D&J or if it is something else.

(persistence, a belief in the Project, and a fervent desire to build a relationship with Delta's membership, it is clear that the imputations cannot be sustained.

The fourth "misrepresentation" mentioned in ¶44 is that an FAQ states "Obedience to leadership is a good thing. Misinformation is not." This statement is trite when read literally, but Delta does not read it literally. Delta claims that this statement implies that Delta's leadership has misinformed people about the Project. But this is not true. Delta is selectively quoting from the FAQ entitled "What is your response to the letter posted on Delta's homepage?". This FAQ contains three paragraphs and says (in pertinent part):

> ... at the time the president's letter was written, she had not seen the project.
> ...
> The people who have chosen not to support have done so in obedience to their President, understandably. They assumed that the film and painting were presented, considered and denied or merit or lack thereof of that we never bothered to seek permission at all. Neither of those two is true. Obedience to leadership is a good thing. Misinformation is not.

Exhibit 2.

It is therefore clear from the entire quote that D&J is referring to the misinformation of those who assumed things about the project or D&J. Delta's attempt to characterize this paragraph as a misrepresentation or slur upon its leadership is clearly erroneous.

The fifth "misrepresentation" mentioned in ¶44 is that an FAQ says that there are vendors producing "distasteful" products using Delta's symbols and others who don't even ask Delta's permission.  The word "distasteful" is clearly opinion, not defamatory.[12]  And there must be vendors seeking to use Delta's symbols without permission or Delta would not describe itself as "vigilant" against them in the same paragraph and would not have a "dedicated staff member whose sole responsibility is to protect Delta's intellectual property, monitor its appropriate use and pursue violators."  Complaint at ¶21.  So how can these statements be misleading, false or defamatory?  Clearly they cannot.

The sixth "misrepresentation" mentioned in ¶44 is that there is a difference as to whether D&J offered to donate the painting to Delta.  Delta says not, D&J says yes.  Delta will have to show how this difference is in any way harmful to it and it cannot.

The seventh"misrepresentation" mentioned in ¶44 is that an FAQ statement disclaiming any support from "the present day organization [Delta]".  Delta claims this is a misrepresentation, at least by implication.  But, as discussed *supra* page 15, a more contextual reading of the disclaimer would indicate that D&J is still, despite everything, hoping to win Delta's approval for the project at some point in the

---

[12]     For example, a depiction of a child sitting on a potty can, in the eyes of the beholder, be either a sweet picture of childhood innocence something almost perverted, akin to child pornography.

future.  Under this contextualized interpretation, there is nothing false or even misleading about what is said and it is not defamatory in any way.  Instead, it holds out the hope that D&J will still be able to reach an accommodation with Delta.

In sum, Delta's claims that the FAQs on www.BlackSororityProject.com are filled with half-truths and innuendo that defame Delta simply do not hold water.  It is clear that Delta brought this lawsuit, at least in part, because D&J "offered Delta no creative rights or control of the project", Complaint at ¶45, and did not offer Delta sufficient money.  *Id.*  and ¶44 (1st "Fact").

### D&J did not need Delta's alleged trade secret as alleged in Count IV because  the information is available on the Internet.

The Uniform Trade Secret Act has been adopted by a majority of states, including the District of Columbia.  District of Columbia Uniform Trade Secrets Act ("DCUTSA"), D.C. Code Ann. §§ 48-501 et seq. (1988).   As a general rule, the acquisition of trade secrets by improper means is prohibited.

So, what is a trade secret?  A "trade secret" is information that: (1) derives independent economic value from not being generally known; and, (2) is subject of reasonable efforts to maintain its secrecy.   "The crucial characteristic of a trade secret is secrecy rather than novelty." *Dionne v. Southeast Foam Converting & Packing. Inc*., 397 S.E.2d 110, 113 (Va. 1990) (stating that limited disclosure with permission and restriction does not prohibit a finding that the information constitutes a trade secret.) (emphasis added); *Dworkin v. Blumenthal* 551 A.2d 947, 950 (Md. App. 1989).

Absolute secrecy is not needed, however, reasonable efforts at maintaining secrecy by the employer are required. *See Id.*

Assuming, *arguendo*, that Delta has taken the steps it claims to have taken to protect its mailing list, is the list of members a trade secret? And, if so, has D&J somehow gotten it by improper means such as "theft, bribery, misrepresentation, breach of a duty or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Dworkin v. Blumenthal* 551 A.2d 947, 950 (Md. App. 1989). Delta claims that D&J must have the membership list. Delta does not specifically delineate why it believes D&J must have the list in the body of Count IV, but Delta does allege that D&J

   i.   "sent a letter and a copy of the DVD to at least twenty-seven (27) Executive Board members." Complaint at ¶43. and
   ii.  sent "an electronic message addressed to the Director of the Eastern Region of Delta" Complaint at ¶41.

The implication, of course, is that D&J could only have gotten this information by accessing, in some underhanded way, Delta' list.

But this implication is completely inaccurate. Delta maintains a comprehensive website as does the Eastern Region. It takes only a few clicks of a mouse to obtain the names of all the members of Delta's Executive Board and just a few clicks more to determine their mailing addresses and/or email addresses.

Exhibit 1 shows just how available this allegedly "secret" or "confidential" information actually is.

Thus, Delta has no evidence, and can adduce no evidence, that D&J have done anything improper. Count IV therefore must fail.

## CONCLUSION

For all the reasons stated above, Delta's Complaint should be Dismissed because it fails to state any claim.

Respectfully submitted,

KAUFMAN LAW, A Professional Corporation
11350 Random Hills Rd. Suite 800
Fairfax, VA 22030
703.764.9080
703.764-0014 (fax)
david@dzklaw.com
Counsel for Defendant D&J Productions, LLC


By: _____
    David Zachary Kaufman, Bar# 435123


CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2007, I caused a true and correct copy of the following to be served by ECR on Devarieste Curry, Esq. counsel of record for Plaintiff Delta Sigma Theta Sorority, Inc.

_____
David Zachary Kaufman