## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DELTA SIGMA THETA SORORITY, INC.)
1707 New Hampshire Avenue, NW )
Washington, DC 20009 )
)
        Plaintiff, )
)
        v. )       Civil Action No.:  06 1993 (RMC)
)
)
DEREK & JAMAR PRODUCTIONS, LLC )
764 Gramatan Avenue )
Mt. Vernon, NY 10552 )
)
        Defendant. )
_____)

### OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

      Delta Sigma Theta Sorority, Incorporated ("Delta" or "plaintiff") files this Memorandum in Opposition to Defendant Derek & Jamar Productions, LLC's ("defendant") Motion to Dismiss.

### I.      INTRODUCTION AND BACKGROUND STATEMENT

      Characterizing the two principals of defendant as artists who simply want to create fine art and whose only error was persistence in making and marketing a documentary about the founding of Delta, defendant filed a motion to dismiss Delta's complaint for injunctive and monetary relief based on federal and District of Columbia common law trademark infringement, misappropriation of a trade secret, injurious falsehood, and defamation.  Defendant argues that Delta has failed to state claims upon which relief can be granted.  As we shall demonstrate in this Opposition, defendant's

motion should be denied.  Delta's complaint is more than sufficient to give defendant fair notice of the claims asserted so as to enable it to answer and prepare for trial.

Before responding to each of defendant's challenges, a bit of background is necessary to place in context the reasons for the filing the complaint and the essence of this case.  This is a case about defendant infringing on and ignoring the rights of plaintiff and using any means necessary to try to get what it wants.  There is a bright line between persistence and using misrepresentations and half truths to invade the rights of others.  Defendant long ago crossed that line.  As set out in detail in the complaint, from the beginning of its dealings with plaintiff, defendant has displayed bad faith and lack of candor.  It has extended its lack of candor to this Court.  For example, seeking to convert to truth one of the misrepresentations that forms the basis of the complaint, defendant argues that communications to a representative of defendant, Craig Williams, should be given no weight because "Delta knew that Mr. Williams was not a part of the project, that the project was that of [defendant]."  Memorandum in Support of Motion to Dismiss at 15 ("Defendant's Brief").  This is a blatant misrepresentation.  As Delta can show at trial, Mr. Williams at all times held himself out as representing defendant.  Moreover, the jacket of the DVD of the documentary shows that Craig Williams is the producer of the documentary.

While plaintiff readily admits that one misrepresentation, viewed in isolation, would not suffice to form the basis of any count, defendant's misrepresentations and half truths cannot be viewed in isolation.  They must be viewed in context.  It is the cumulative effect of defendant's actions and defendant's intent that forms the basis of the Complaint, and, as will be discussed in detail later, courts have recognized that a lack of

good faith may properly be viewed as the infringer's intent to trade on the good will of the trademark holder.

Delta is a not-for-profit service organization centered on the shared communal experience of predominantly black, college-educated women dedicated to social change, educational advancement, economic development; educational development; international awareness and involvement; physical and mental health; and political awareness and involvement. The Complaint sets out in detail the exponential growth of Delta since its founding and how it has worked diligently to fulfill its mission. The Delta community is both broad and deep but tightly knit, and the national recognition Delta has received over the years is enviable and longstanding.

As a national organization, Delta's obligations thus are to act in the best interests of its membership and in compliance with its governing bylaws to fulfill its service mission. While Delta engages in numerous efforts to promote its mission and continue the legacy of its founders, it has no obligation to non-members, even when it comes to making a documentary about Delta's own remarkable Founders. Accordingly, based on its assessment that defendant's proposal for Delta's assistance in making the *Black Sorority Project: The Exodus* was not in Delta's best interests, Delta's Board voted unanimously not to support or endorse the project. The Board did not view defendant's company as the type of entity with which Delta wanted to enter into a business arrangement.

There were four primary reasons for the Board's decision. First, defendant made major misrepresentations regarding prior approval of the project by other Deltas, including a prominent Delta in the literary arts field, who not only had not approved the

project, but strongly had recommended that Delta not lend its support. Second, defendant presented a proposal of limited details only a few months before the planned launch of the project, including no timelines or details as to how Delta would benefit.  Third, the strategic marketing plan presented to Delta in September 2005 made clear that defendant wanted Delta to market the project, and identified ten (10) ways Delta's resources would be highly impacted, but again provided no detail as to how Delta would benefit.  In particular, Defendant wanted aggressive and repetitive outreach to Delta's extensive and proprietary membership list.  Fourth and finally, Delta was asked to endorse and support a project over which it would have had no artistic, creative or other control. Delta's name and image are too valuable to relinquish control of them to others, irrespective of how attractive a project might appear to be on the surface.  All of these facts convinced the Board that it would have been breaching its fiduciary obligations to Delta to endorse the Project.

        Although Delta opted not to accept the responsibilities and obligations that would have been attendant to entering into a business arrangement with defendant, it did not attempt to prevent the making of the *Black Sorority Project.*  It merely made reasonable requests designed to protect its valuable trademarks, as anyone would do in the prudent course of ordinary business.  One request was that defendant not misrepresent the facts as to Delta's support.  Specifically, Delta asked that the documentary affirmatively disclaim any approval, involvement, support, or endorsement by Delta, that defendant not state suggest, imply, or indicate that Delta or any of its Executive Board members in any way endorsed, supported, sponsored, approved of, or was involved in the *Black Sorority Project*, and that defendant not misrepresent the level of support of individual members,

including prominent members.  Defendant did just the opposite; it misrepresented the facts as to support by a past national president, and it printed an unclear disclaimer at the end of the documentary suggesting that Delta had approved the project, but not the "*present day organization of Delta.*"(emphasis added)

Unable to accept Delta's reasoned decision not to work with it, and determined to access Delta's vast membership base, defendant launched an unrelenting campaign to harass Delta leadership and tarnish Delta's reputation among its members and the public at large.  Defendant also deceptively incorporated Delta's trademark into packaging for the DVD in a manner clearly designed to confuse consumers as to Delta's affiliation. These actions have jeopardized both Delta's financial well being and its reputation.

The damage posed by defendant's retaliation against Delta is real.  As a membership organization, Delta depends for its existence largely on its members and their voluntary payment of dues.  Ethical lapses – real or perceived – have undermined the public's trust in the non-profit sector and fostered a wariness for scandal.  Recently, high profile non-profit organizations have been the subject of negative headlines and investigations because of alleged ethical lapses, including the Nature Conservancy, the Red Cross, and the United Way.  Non-profit organizations must govern with care and administer their affairs with heightened sensitivity to member expectations.  Like other non-profits, the Delta Board acted in what it believed to be its fiduciary obligation to the organization.

Delta brings this action to force defendant to remove disparaging published materials that allege improper conduct by Delta and its leadership, and to force defendant to cease misusing and diluting Delta's trademarks.  The mere perception of impropriety

by Delta would significantly damage Delta's reputation. Defendant's innuendos and untruths are intended to cause just such damage. In bringing this action, Delta has presented five claims, each of which gives defendant fair notice of the claims asserted so as to enable it to answer the Complaint and prepare for trial. Plaintiff withdraws one claim in this Opposition, but asserts that the remaining claims give defendant fair notice of the claims asserted so as to allow the parties to proceed to discovery and, ultimately, to trial.

## II.    STANDARD OF REVIEW FOR MOTION TO DISMISS

It has long been established that dismissal of a complaint is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Bame v. Clark,* 466 F. Supp. 2d 105, 107 (D.D.C. 2006). As this Court has recognized, in resolving a Rule 12(b)(6) motion, the Court must treat the complaint's factual allegations -- including mixed questions of law and fact -- as true and draw all reasonable inferences in the plaintiff's favor. *Bame v.Clark,* 466 F. Supp. 2d at 107 (citations omitted). The Court also has noted that to survive a motion to dismiss, it is not necessary for the plaintiff to plead all elements of his prima facie case, or to plead law or match facts to every element of a legal theory. *Id.* (internal quotations and citation omitted).

Under this accepted rule, defendant cannot demonstrate beyond a doubt that Delta can prove no set of facts to support its claim. The facts satisfy the prima facie elements of each count presented below, and, at a minimum, present genuine questions that plaintiff should be allowed to explore in discovery and, ultimately, at trial.

## ARGUMENT

### III.    COUNTS I & II: TRADEMARK INFRINGEMENT

#### A.    Defendant's Use of Delta's Mark Is Likely To Cause Confusion And, Thus, Constitutes Infringement.

To prevail on its claim of trademark infringement under federal law, Delta must show: (1) that it owns a valid trademark; (2) that the mark is distinctive or has acquired secondary meaning; and (3) that there is a likelihood of confusion. *Sears, Roebuck & Co. v. Sears Fin. Network, Inc.*, 576 F. Supp. 857 (D.D.C. 1983); *American Assn. for the Advancement of Sci. (AAAS) v. Hearst Corp.*, 498 F. Supp. 244 (D.D.C. 1980). The basic analysis for common law trademark infringement is identical to that for trademark infringement or unfair trade practices under Section 43(a) of the federal Lanham Act – likelihood of confusion. *Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) (citing 3 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 23.01[1] (rev. ed. 1994)); *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989) (noting that the law of unfair competition has its roots in the common-law concern with protecting consumers from confusion as to source). Court Opinions evaluating claims of likelihood of confusion can be used interchangeably whether the claim is statutory or common law. The test remains the same. The crucial focus of inquiry on the issue of likelihood of confusion is the effect of defendant's mark on prospective purchasers. *Sears,* 576 F. Supp. at 861; *AAAS*, 498 F. Supp. at 258.[1]

In this case, there is no issue with regard to the first two elements of the *Sears* test. Defendant does not dispute the unassailable strength, validity and distinctiveness of

---

[1] The standard is the same state a common law District of Columbia trademark infringement claim.

Delta's trade name and family of trademarks. The only analysis necessary for a finding of infringement is to satisfy the third prong of the *Sears* test – that the relevant purchasing public is likely to be confused by defendant's use of the mark. The principle question is whether "an appreciable number of ordinary prudent consumers are likely to be misled, or simply confused, as to the source of the goods in question." *Sears*, 576 F. Supp. at 861 (citations omitted). Plaintiff has alleged sufficient facts to suggest they will.

In assessing the likelihood of confusion, courts have long relied on the analysis set forth in *Polaroid Corp. v. Polarad Electronics Corp.* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820 (1961). There, Second Circuit held that the following non-exhaustive list of factors are to be evaluated in determining likelihood of confusion:

> (1) the strength of the plaintiff's mark;
> (2) the degree of similarity between the two marks;
> (3) the similarity of the products;
> (4) the likelihood that the prior owner will bridge the gap between its market or business and the second owner's market or business;
> (5) evidence of actual confusion;
> (6) the defendant's purpose or reciprocal of good faith in adopting its own mark;
> (7) the quality of defendant's product; and
> (8) the sophistication of the buyers.

*Id.* at 495.

When applying the *Polaroid* factors, the court must consider not only the potential for consumer confusion as to the *source* of the marks in question, but should also consider the potential for confusion as to the "sponsorship, affiliation, connection, or identification" of those marks. *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 383 (2d Cir. 2005). The likelihood of confusion standard is predominantly factual in nature; thus a motion to dismiss is inappropriate when a jury could reasonably conclude confusion

might exist.  *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1008 (9th Cir. 2001) (quoting *Wendt v. Host Int'l, Inc*., 125 F.3d 806, 812 (9th Cir. 1997)).

Application of the *Polaroid* test demonstrates that defendant's use of Delta's marks fosters both confusion as to source and improper inference of Delta affiliation and sponsorship.

### 1.     Delta's Name and Marks Are Undisputedly Strong.

Delta's family of marks is indisputably strong and famous.  As alleged in the Complaint, since its founding in 1913, Delta has been known to its members, other members of the National Pan-Hellenic Council (an umbrella organization of the nine African American Greek letter organizations), educational institutions, and the general public not only by its official name "Delta Sigma Theta Sorority, Incorporated," but also as "Delta," "Delta Sigma Theta," and "Delta Sorority."  It also is known and recognized by its Greek letter symbols – "ΔΣΘ."  Any iteration of Delta's name and its Greek letter symbols is famous and recognized as belonging only to Delta.  Delta is similarly identifiable by its signature trade dress color combination of red and white, as was recently acknowledged by the Fifth Circuit in *Alpha Kappa Alpha Sorority Inc. v. Converse Inc*.  2006 U.S. App. LEXIS 8775 (5th Cir. April 10, 2006) (reversing the lower court's order dismissing Delta's unfair competition and trademark dilution claims on the grounds that they did not state a claim).

Attempting to minimize the harm of its infringement, defendant alleges on its website that Delta does not aggressively police its marks, stating that "[t]here are countless images out there that are mass-produced, made by non-Greeks that make blatant and often distasteful use of Delta (and other BGLO) symbols solely for profit [].

These people do not seek permission to create their crafts and often become approved vendors." *See Black sorority Project* http://www.blacksororityproject.com/faq.htm (last visited March 21, 2007).

This is a gross misstatement. Delta can demonstrate that, to prevent dilution it vigorously protects the substantial goodwill and reputation associated with its valuable marks. Delta prohibits the distribution and sale of merchandise bearing its marks except through authorized and licensed manufacturers and distributors. Delta receives hundreds of requests from vendors seeking a license to sell products and merchandise imprinted with Delta's name(s) and/or one of its many symbols or marks. As Delta can demonstrate, it grants a license to only those vendors who meet its strict licensing requirements. Delta additionally regulates channels of trade. For example, Delta enforces strict vendor regulations that prohibit any items bearing Delta trademarks from being sold via the Internet. Delta undertakes these rigorous standards to protect the value of and goodwill associated with its name and marks.

### 2.     Defendant Acknowledges Using Delta's Marks.

The second factor, "similarity of the marks," is not in dispute because defendant acknowledges using Delta's mark. Defendant admits it "put the full name of Delta on the front and back of the DVD and its cover," "used the full name of Delta" and "the Greek symbols for Delta" in the documentary, and "used the full name of Delta in advertising." Defendant's Brief at 3. Defendant's use is also apparent from observing the packaging of the product. In addition to using both Delta's word mark, "Delta Sigma Theta," and its Greek letter logo mark, "$\Delta\Sigma\Theta$," the DVD and its packaging also use Delta's red and white trade dress colors in combination with these marks. There is no disclaimer printed

10

anywhere on the DVD packaging to differentiate between Delta and defendant. Defendant has used Delta colors and recognized trade dress in conjunction with its mark to create the impression that Delta was the source of, or affiliated with creation of the documentary.

### 3. Defendant's Documentary Is A Product Likely To Be Associated With Delta.

Where the product in question is similar to or competitive with products of the original trademark holder, the likelihood of confusion increases. *Sears*, 576 F. Supp. at 863. That is the case here. While defendant is marketing the 45 minute DVD for the extraordinary price of $39.99 (or $125 in a package with a mass-produced offset print), in substance the product, *Black Sorority Project*, falls squarely within the current range of Delta efforts.

Delta has a history of involvement with artistic projects, and a documentary on the story of Delta's founding is exactly the type of project Delta ordinarily would support or initiate. In fact, Delta is best positioned to craft a historically accurate documentary of its genesis – with unfettered access to historical documents and individuals with knowledge of Delta – and logically most likely to do so. There is actual similarity of products, as discussed in more detail below.

In 1973, Delta established its National Arts and Letters Commission, which sponsors nationally-acclaimed programs in the visual, literary, and performing arts and has produced works for cultural and educational purposes. The Commission fosters artistic projects under the leadership of nationally-recognized Delta artists and educators such as actress Ruby Dee, renowned opera singer Leontyne Price, and noted author Paula Giddings. For example, in July 2006, it re-mastered in compact disc format the album

"Roses & Revolutions," which it produced more than twenty years ago in conjunction with its subsidiary, DST Telecommunications, Inc. This Commission has worked together with Delta's Heritage and Archives Committee to preserve and promote Delta's rich historical legacy. Delta commissioned member Paula Giddings to write the much acclaimed IN SEARCH OF SISTERHOOD: DELTA SIGMA THETA AND THE CHALLENGE OF THE BLACK SORORITY MOVEMENT, a non-fiction examination of the founding and history of Delta, relied upon by defendant in making its documentary. Delta has also produced a portrait similar to that created by defendant. In 1985, Delta commissioned visual artist Tarelton Blackwell do a large scale painting of the Founders of Delta, which now hangs in the lobby at Delta's headquarters.

Finally, in 2003, in conjunction with the celebration of its 90th anniversary, Delta produced a historical documentary about its founding and programs, including interviews with all of its past Delta Presidents. Given its past endeavors, anyone reasonably familiar with Delta would be likely to presume that producing or supporting a documentary – on any related topic – would be something Delta would undertake. This is particularly true where the documentary concerns Delta's own history and role in the suffragette movement, and most especially true when packaged so as to create that very impression.

### 4. Delta's Products and Defendant's Product Target An Identical Market.

There is no leap required to "bridge the gap" between Delta's market and Defendant's desired market, just as there is no gap between Delta's current use of its marks and its future use of those marks in connection with a historical documentary. Delta is just as desirous of protecting its goodwill among its membership as defendant is of selling its DVD to that potential market. Despite the compelling nature of Delta's

genesis, it is a commercially reasonable presumption that sales of the DVD will be almost exclusively to members of the sorority.  In fact, defendant has admitted as much.  *See* Complaint at ¶ 37.  Defendant's focus on this narrow market for which Delta's marks have special meaning increases the likelihood of confusion.

The nature of the relationship between a sorority and its members is unique; sorority affiliation fosters long term affection and goodwill among members, and a loyalty far beyond traditional brand loyalty.  Membership is inclusion in a sisterhood. This renders the market more vulnerable to exploitation, because there is no expectation of competition in the sisterhood connection between members and the sorority.   The name, logo and other indicia of the sorority signal official connection to the sorority. Because the Delta marks immediately will evoke a connection to Delta in the minds of its members, any use of Delta mark on a commercial product creates a likelihood of confusion as to source or sponsorship.

Defendant is not to be faulted for creating an unaffiliated documentary about Delta; however, given the complete alignment of markets, defendant must be prohibited from falsely implying Delta's sponsorship though misuse of Delta's marks.  Defendant's actions using Delta's marks are *not* incidental to the documentary, but *are* deliberately designed with the commercial intent to confuse Delta's membership into presuming Delta sponsorship, a gambit to increase sales among Delta's membership.  Given that the content of the documentary is itself not disparaging (which might alert a consumer to non-affiliation), but simply a historical retelling similar to what Delta might produce, there is an even greater likelihood of confusion.  With any narrowly tailored historical documentary about a specific organization, it is reasonable, in fact, probable, to presume

the organization was involved.  Visual association of trademarks only increases this likelihood of confusion.  *See, e.g., Jones v. Ground Zero Entm't*, 2006 U.S. Dist. LEXIS 44364, *4 (S.D.N.Y. June 28, 2006).

> 5. **Discovery Will Yield Evidence Of Both Actual And Likely Confusion.**

The use and placement of Delta's mark on Defendant's DVD packaging is designed to mislead potential consumers and broaden Defendant's narrow market by implying affiliation with Delta.  Defendant has placed Delta's mark on the DVD cover in a position of prominence normally reserved for the creator of a work, and in lettering significantly brighter than its background.  The location and font size of the mark on the front cover are extremely suggestive of authorship and accreditation – yet only Delta's mark is featured; defendant's is noticeably absent.  Further, the lettering and background color on the back are in Delta's trademark red and white combination.  Moreover, Defendant has intimated Delta's endorsement by marketing the DVD in a manner affiliated with Delta, attempting to sell the products at Delta meetings, and initially screening the film in Philadelphia, the site of Delta's 48th National Convention, during the time of the Convention.

Publication of defendant's DVD has caused actual confusion as to source among Delta membership, the target market for this product. Both Defendant and Delta recognize that confusion exists.  At the website created for the *Black Sorority Project*, defendant posted a Frequently Asked Questions ("FAQs") page in direct response to actual confusion.  In those FAQs, defendant notes that it was contacted by "people who were unclear," and expresses the need to "clear up the confusion."  *Black Sorority Project*, http://www.blacksororityproject.com/faq.htm (last visited March 21, 2007).

Defendant acknowledges that its failure to clarify Delta's decision not to participate "gave rise to more confusion among Deltas." *Id.*

Delta also has witnessed actual confusion. Defendant's efforts to reach members have prompted numerous questions among Delta's members, who inundated the Executive Director and the President with inquiries about Delta's apparent participation in the film. The need to post notices at both the Delta and the *Black Sorority Project* websites evidences actual confusion. At a minimum, it is clear that a likelihood of confusion exists and that dismissal would be improper as the question should be presented to a jury.

> **6.    Defendant's Purpose in Using Delta's Mark Rather Than Its Own Was to Cause Confusion and Increase Sales.**

Defendant did not show good faith by visibly displaying its own mark. Rather, it has used Delta's mark to mislead potential purchasers in order to increase DVD sales. Defendant accedes how critical Delta's endorsement is to production and sales of the documentary, noting that "several famous African-American historians are members of Delta, and without Delta's imprimatur they declined to assist [defendant]." Defendant's Brief at 2, n.1. The likely market for defendant's product is narrow, probably to the point of exactly mirroring Delta membership. Successful access to this market hangs both upon Delta's positive endorsement and Delta's proprietary contact information for members. Discovery likely will establish that Delta's refusal to endorse defendant's product will negatively impact sales. Inclusion of Delta's mark in a manner designed to mislead this market is a desperate attempt by defendant to increase sales by confusing consumers. Defendant's dependence upon Delta to foster sales is behind its relentless badgering of Delta leadership and unremitting pressure on Delta to support sales of the

DVD and provide access to members. A documentary maker concerned only with artistic success would not be so aggressive. Clearly, defendant seeks only to exploit Delta members' close-knit ties to the sorority in order to sell its products.

Additionally, defendant has acted in bad faith in proceeding with use of Delta's trademarks despite (1) refusal of Delta to participate in the project prior to the infringing use; (2) Delta's explicit request prior to design of the DVD packaging (and infringing use) that defendant not use Delta marks; (3) evidence of actual confusion; and (4) refusal to cease and desist use of Delta marks upon request by Delta after evidence of actual confusion became apparent. *See, e.g., Partido Revolucionario Dominicano (PRD) Seccional de Metropolitan de Washington DC, Maryland y Virginia,v. Partido Revolucionario Dominicano, Seccional de Maryland y Virginia*, 312 F. Supp. 2d 1,15 (D.D.C. 2004) (intent to infringe and bad faith evidenced by continued use of the infringing mark after receiving a cease and desist request); *Malarkey-Taylor Assoc. v. Cellular Telecomm. Indus. Ass'n*, 929 F. Supp. 473, 478 (D.D.C. 1996) (bad faith evidenced in refusal to cease and desist use of mark after notification of infringement).

As further evidence of bad faith, as alleged in the Complaint, defendant from the beginning has been manipulative and untruthful in order to gain Delta's support for its project. Prior to release of the project, Defendant was untruthful with Delta leadership. Subsequent to the production of the DVD, defendant has been misleading the public regarding Delta. *See Black Sorority Project* www.blacksororityproject.com/faq.htm (last visited March 21, 2007) (responses to FAQs alleging, for example, that Delta leadership provided misinformation to its membership and that a prior president of Delta was supportive of the project).

7.    **The Quality Of The *Black History Project* Is Immaterial.**

The seventh element of the Polaroid test is not illustrative or relevant to the present analysis, as the quality of the *Black Sorority Project* is not at issue. Certainly the story of the founders' heroism does not negatively impact Delta, and aspects of the documentary are compelling.

8.    **Defendant Has Used Delta's Mark To Target A Specific And Vulnerable Purchasing Group: Delta Membership.**

As discussed above, Delta membership is a particularly vulnerable market because there is no expectation of competition in connection with sorority trademarks, increasing the likelihood of confusion. Delta marks on a product signals to a reasonably observant and intelligent Delta that the product is affiliated with the sorority. To overcome the presumption that use of the Delta mark signals source or affiliation, any non-trademark use must be expressly disclaimed in an obvious and proximate manner. In the present case, Delta specifically requested this from Defendant. Defendant did not comply.

Defendant argues that it has properly disclaimed affiliation with Delta. This is untrue. First, the disclaimer is nonsensical. It reads: "The Black Sorority Project is an independent historical initiative and is in no way funded, supported, endorsed or promoted by the present day organization Delta Sigma Theta Sorority, Inc. The views expressed herein are objective, unbiased and based solely on scholarship and historical record." Leaving aside the absurdity that the author of content can self-certify that content as objective and unbiased, the language regarding Delta simply makes no sense. By qualifying the disclaimer to "the present day organization," is defendant suggesting it has the support of a past Delta organization? Or is Defendant trying to suggest that he

would have the support of future Delta organizations?  There is but one Delta organization.  And what if the DVD lasts for fifty years but still disclaims "present," what meaning does it carry then?  As a clarifying tool, the disclaimer is useless, and in fact it only engenders greater confusion with its obtuse wording.  The misleading disclaimer supports the general tone of disparagement defendant has adopted in all of its dealings with Delta, as is discussed more fully below regarding the defamation claim.

Assuming for argument that the language of the disclaimer was satisfactory, which it is not, its inclusion where it cannot be viewed prior to purchase is patently disingenuous.  Nowhere on the packaging of the DVD is there a disclaimer of affiliation with Delta.  Limited to review of the product itself, it would be impossible for a purchaser to see any disclaimer prior to purchasing the product.  With regard to the website, Defendant is once again caught in an untruth.  Despite boasting at the *Black Sorority Project* website in the FAQs that the disclaimer appears at "every page of our website," a few simple mouse clicks reveals this to be untrue.

For an item such as a DVD, consumers make purchasing decisions at the point of purchase, predominantly based on the appeal of the item held in their hand and the amount of money contained in their wallet.  In this case, even if a purchaser were exceptionally sophisticated and diligent, it would be difficult for her to ascertain the truth of source at the point of purchase.  Publication of notices at both defendant's and Delta's websites can do little to abate consumer confusion.  Consumers faced with a purchasing decision are unlikely to stall that choice in order to log on to and visit the perceived source's website to verify sponsorship.  This would be too high a burden to expect.  Moreover, the majority of Delta members do not visit the website and would not have

seen Delta's notice.  Nor should a purchaser be required to watch the entire documentary in order to reach the misleading disclaimer buried at the end.  Absent those extreme measures at the time of making a purchase decision, a reasonable purchaser would have no way to differentiate source between Delta and defendant based on appearance of the product.  This results in a high likelihood of confusion.

> **B.    Defendant Does Not Present Any Persuasive Defenses to Infringement.**

Defendant vaguely alleges, without invoking any specific defense, that its use of Delta's mark is "permissible" because "there is no possible way the Black Sorority Project can be done without making reference to Delta," and that Delta's trademark is being used "fairly" and "in good faith only."  Defendant's Brief at 7.  Defendant then suggests because it only used it a "little" bit, it does not count.  *Id.*  Delta does not agree that displaying its valuable marks on the front cover, back cover and in the documentary video itself constitutes "little" use – in fact one wonders where else defendant might possibly have squeezed it in – nor does Delta believe that defendant's prominent use of the mark was necessary in packaging a DVD entitled *Black Sorority Project: The Exodus*.

Defendant also ignores the fact that Delta does not object to its *referencing* Delta, but to the prominent misappropriation of Delta's mark in such a way as to cause confusion as to the source of the project and Delta's affiliation with it.  Nonetheless, while defendant's conclusory statements are vague and unpersuasive, this Opposition will address defendant's failure to satisfy the requirements for any of the three recognized defenses to trademark infringement: fair use exemption, First Amendment claims and the *Rogers v. Grimaldi* test.

1.    **Defendant Does Not Have a Fair Use Defense Because The Infringement Causes Confusion As To Source.**

Defendant cites *New Kids On The Block v. News America Publishing, Inc.*, 971 F.2d 302 (9th Cir. 1992), to support its defense of fair use. However, analysis of the very case upon which defendant relies, as well as subsequent court opinions interpreting that case, does not support defendant's position. This case is factually distinguishable from *New Kids*. Moreover, assuming for argument's sake that *New Kids* was pertinent to the facts of this case, application of the *New Kids* test disqualifies defendant from claiming a fair use exemption because it fails the second prong of the test set out in that case.

In *New Kids*, because that defendant used plaintiff's mark to describe *plaintiff's* product, the Ninth Circuit approved the use under a variant of the fair use test called "nominative fair use." In the case before this Court, defendant used Delta's trademark on its DVD cover to describe *defendant's* product rather than any product of Delta. Simply because defendant's documentary is *about* Delta, does not make it a product *of* Delta. *See, e.g., Jones*, 2006 U.S. Dist. LEXIS 44364, at 4-5 (dismissing nominative fair use defense where infringer used name of documentary subject on DVD cover).

In reaching its holding in *New Kids*, the Ninth Circuit in fact noted "[T]his is not the classic fair use case where defendant has used plaintiff's mark to describe the defendant's *own* product." 971 F.2d at 308. The traditional fair-use defense permits use of a protected mark by others to describe certain aspects of the user's own goods. *Pebble Beach Co. v. Tour 18 I*, 155 F.3d 526, 545 n.12 (5th Cir. 1998) (citing 15 U.S.C. § 1115(b)(4)); *Jones* 2006 U.S. Dist. LEXIS 44364, *4. But, use of the term or name as a *mark* defeats the traditional fair use defense. *Id.*

The present fact pattern presents a traditional fair use issue – defendant has used Delta's mark on defendant's *own* product, the video.  But this defense provides no safe harbor for defendant.  For this defense to be applicable, defendant must have used Delta's mark (1) other than as a trademark; (2) in a descriptive sense; and (3) in good faith.  15 U.S.C. § 1115(b)(4).  Defendant's disingenuous use of Delta's mark on the DVD packaging in a manner designed to suggest authorship or sponsorship constitutes use as a trademark, and the visual prominence given the mark, its position where accreditations might be found, and accompaniment by Delta trade dress establish that the mark was not used in a descriptive sense.  *See, e.g.*, *Jones*, 2006 U.S. Dist. LEXIS 44364, at 4-5. Defendant thus fails the first two prongs of the test.  Moreover, defendant's use was not in good faith; it, thus fails the third prong of the fair use test.  *Id*.; *see also EMI Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos, Inc.,* 2000 U.S. App. LEXIS 30761, *24 (2d Cir. Sept. 15, 2000) ("a lack of good faith [is equated] with the subsequent user's intent to trade on the good will of the trademark holder by creating confusion as to source or sponsorship.").[2]

Unlike a documentary where the disputed mark is part of the title, such as the *Walmart: The High Cost of Low Price* or *Enron: The Smartest Guys In The Room*, defendant's *Black History Project: The Exodus* does not incorporate Delta's mark in its title, and thus Delta's mark does not need to be on the cover.  Defendant's work, with its

---

[2]    Defendant might have met the test had it only made references to the Delta name within a documentary related to a historical retelling of Delta's founding.  But, defendant did more.  Furthermore, even assuming the nominative fair use test articulated in *New Kids* applied, defendant fails that test as well for the same reasons it fails the traditional fair use test: it used Delta's marks to suggest Delta's endorsement.  The court in *New Kids* held that there is a fair use defense where infringement meets the following three requirements: (1) the product or service in question must not be readily identifiable without use of the trademark; (2) only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and (3) the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.  *New Kids*, 971 F.2d at 308.

distinct title, is readily identifiable without Delta's mark on the DVD packaging, and defendant need not have – in fact should not have – used Delta's mark as it has on the cover. Delta does not expect there would be *no* references to the sorority or its name in *Black Sorority Project*. Making a documentary about the founding of Delta without making any reference to Delta would be impossible. What Delta seeks to prevent is the *infringing* use of its valuable marks in ways that designates it as the source or sponsor of the DVD. Were Delta to ignore infringement by defendant, it would send a message that it does not police its marks and thereby would render its marks vulnerable to dilution.

*Jones v. Ground Zero Entertainment*, 2006 U.S. Dist. LEXIS 44364, *4-5 (S.D.N.Y. June 28, 2006) is factually parallel and is illustrative. In that case, Kimberly Jones, publicly known as "Lil' Kim," had been a member of the rap group "Junior M.A.F.I.A." Several years after she severed her association with Junior M.A.F.I.A., defendant produced, marketed, and distributed under the label "Ground Zero Entertainment" a documentary DVD titled "The Chronicles of Junior M.A.F.I.A." The packaging for the documentary featured the name "Lil' Kim" and Jones's likeness on its cover and promotional materials. Jones filed suit alleging that use of her trademarked name constituted false endorsement and created a likelihood of confusion.

Finding that Jones was likely to prevail on her claim that defendants' use of her trade name constituted false endorsement, the court granted Jones a preliminary injunction. The court's decision turned in large measure on the placement of Jones' marks on the DVD cover. In holding that defendants were not entitled to either a traditional or nominative fair use defense, the court noted that, "[b]ecause the "Lil' Kim" mark appears prominently on certain of the covers of the DVD, as well as some of the

promotional material, in a manner that suggests endorsement, 'an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.'" *Id.* at *3 – 4 (quoting *Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002))*; *see also EMI Catalogue, 2000 U.S. App. LEXIS 30761* at *10 ("If consumers believe that the trademark owner sponsors or endorses the use of the challenged mark, the confusion requirement is satisfied.").  The same is true here.  Defendant's use of the Delta mark in a manner implying endorsement is not fair use but use as a trademark, and therefore the trademark infringement claim should not be dismissed.

> **2.   Defendant Does Not Have A First Amendment Defense Because Defendant's Commercial Use Fails The Three Tests.**

Despite the arguably artistic nature of the documentary, defendant is not entitled to First Amendment protection.  As noted in *Parks v. Laface Records,* 329 F. 3d 437 (6th Cir.), *cert. denied*, 540 U.S. 1074 (2003), "the First Amendment cannot permit anyone who cries 'artist' to have *carte blanche* when it comes to naming and advertising his or her works, art though it may be." *Id.* at 447.  Every purchaser, whether they are buying cosmetics, cooking ingredients or art has a right not to be misled as to source or endorsement of a product.  *See Rogers v. Grimaldi*, 875 F.2d 994, 997 (2d Cir. 1989); *see also Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 886 F.2d 490, 493 (2d Cir. 1989) ("Trademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression." (citation omitted)).  In balancing the interests of First Amendment expression against trademark protections, courts have adopted three tests: (a) the likelihood of confusion test; (b) the "alternative avenues" test; and (c) the *Rogers v. Grimaldi* test.  *Parks*, 329 F.2d at 447.  Each is discussed below.

a.    **Defendant's Use Of Delta's Mark Fails The Likelihood Of Confusion Test.**

The likelihood of confusion factors applied in traditional, trademark cases has also been applied to determine whether a First Amendment defense is justified. *Parks*, 329 F.3d at 447. Essentially, the *Polaroid* factors are applied to decide if the plaintiff has raised a genuine issue of material fact as to the likelihood of consumer confusion. *Id.* at 438. The Ninth Circuit adopted this approach in *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997). *Id.* *See also Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996) (similar inference by the Tenth Circuit, suggesting the likelihood of confusion test "serves to avoid First Amendment concerns" in trademark cases); *Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F. Supp. 2d 1068, 1078 (C.D. Cal. 1998).

As discussed extensively above, application of the *Polaroid* factors to defendant's use of Delta's mark in connection the *Black Sorority Project* clearly establishes that there exists a likelihood of confusion as to the source of the project and as to whether Delta is affiliated with the project. Therefore, defendant cannot prevail on a First Amendment defense.

b.    **Defendant's Use Of Delta's Mark Fails The Alternative Avenues Test Because Use Of Delta's Trademark Is Unnecessary To Market A Work Titled *Black Sorority Project*: The Exodus.**

A second recognized test is the "alternative avenues" test. *Parks*, 329 F.3d at 447. Under this test, an expressive work will not be protected from a false advertising claim if there are sufficient alternative means for an artist to convey his or her idea. *Id*; *see also American Dairy Queen Corp. v. New Line Prods., Inc.*, 35 F. Supp. 2d 727, 734 (D.

Minn. 1998) (no First Amendment protection for an infringing movie title because there were other titles the producers could use).

In this case, defendant did not need to situate and emphasize Delta's mark in the place and manner that it did. The documentary is entitled *Black Sorority Project: The Exodus*. Though its founders are the subject, Delta's name need not have been a part of the title. No artistic or substantive element necessitated inclusion of Delta's trademark on the front and back of the DVD cover. Yet the defendant placed Delta's mark in a place of prominence normally reserved for the creator of a work. Defendant not only used Delta colors and recognized trade dress, but leveraged the mark beyond the basic referential level needed to tell the story. As featured on the DVD packaging, defendant's use of Delta's mark is designed to create the impression that Delta was the source of or was affiliated with creation of the documentary. This was done even though there were alternative choices available for designing the packaging. Defendant's use thus constitutes infringement and is not entitled to First Amendment protection.

### c. Defendant's Use of Delta's Mark Misleads As To Source.

A third test is the one developed in *Rogers v. Grimaldi*. *Parks*, 329 F.3d at 447. *Rogers* established that use of a trademark is not permitted under the First Amendment when either of the following is true: (1) use of the trademark has "no artistic relevance" to the underlying work; or, (2) if there is artistic relevance, the title "explicitly misleads as to the source or the content of the work." *Rogers*, 875 F.2d at 999. *See also Mattel Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) (test adopted by Ninth Circuit panel); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 664-65 (5th

Cir. 2000) (test adopted by Fifth Circuit); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 339 (E.D. Penn. 1996) (test adopted by a Third Circuit district court).

This test is essentially the same as the nominative fair use test applied in *New Kids*, 971 F.2d 302. While the use of Delta's name arguably has artistic relevance to the underlying work in that "the work" is a history of Delta's founders, defendant cannot meet the second prong of the test. Defendant's use of Delta's name was misleading as to Delta's endorsement of the project. Defendant thus is not entitled to claim First Amendment rights of fair use defense. At a minimum, whether defendant's use of Delta's marks is misleading is an issue to be resolved by a finder of fact following an evidentiary hearing.

## IV.    COUNT III: INJURIOUS FALSEHOOD

Injurious falsehood is generally used to describe a group of torts also known as disparagement of property, slander of title or trade libel. *Golden Palace, Inc. v. National Broad. Co.*, 386 F. Supp. 107, 109 (D.D.C. 1974), *aff'd without opinion*, 530 F.2d 1094 (D.C. Cir. 1976); *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1141 (3d Cir. 1977). It is closely related to traditional libel and slander except that the injury is not to personal reputation, but rather to the plaintiff's interest in, or the quality of, the plaintiff's property. *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155 n.6 (D.C. Cir. 1985); *Whetstone Candy Co. v. Nat'l Consumers League*, 360 F. Supp. 2d 77, 80 (D.D.C. 2004). To state a claim for injurious falsehood, plaintiff must allege pecuniary harm resulting from the defendant's disparagement. *Art Metal-U.S.A*, 753 F.2d at 1155; *Golden Palace*, 386 F. Supp. at 109.

Delta has provided sufficient evidence of the elements underlying its claim that a reasonable juror could find in its favor. Delta has a valid and strong business relationship with its voluntary members, as well is in the community at large where Delta effects its public service endeavors. Defendant, with knowledge, has jeopardized the organization's financial stability, membership, and ability to carry out its mission. Defendant has publicized statements on its website and to third parties that are false and derogatory, and which create a general impression that Delta leadership is inefficient, self-serving, and deceptive, and has acted improperly and exercised poor management judgment. Specific statements are identified in the complaint and in more detail accompanying our defamation analysis below. Defendant made these disparaging inferences with the intent of influencing Delta membership, in fact exhorting Delta members to "contact your national office…. We can only make so many attempts without being a bother." *See Black Sorority Project* http://www.blacksororityproject.com/faqs.htm#q9 (last visited March 21, 2007). Defendant's false and derogatory statements to third persons diminished Delta's standing among its members and supporters. Defendant was aware that inference of improper behavior by the Delta Board would cost Delta membership dues and contributions from its voluntary members, resulting in specific damage. Loss of support hinders Delta's ability to effect its operations in the public service field, which constitutes Delta's business practices.

## V.     COUNT IV:  MISAPPROPRIATION

Plaintiff pleaded this count in good faith and still believes its allegations. Under the circumstances, however, plaintiff believes it would be difficult to obtain discovery to

substantiate its claim. Given that and the strength of its other counts, plaintiff withdraws this count.

## VI.     COUNT V:   DEFAMATION

Contrary to defendant's assertion, plaintiff has alleged facts sufficient to state a claim for defamation under District of Columbia law.  Defendant's website contains defamatory remarks that constitute libel.   A statement is "defamatory" if it tends to injure the plaintiff in its trade, profession or community standing, or lower it in the estimation of the community.  *Howard Univ. v. Best,* 484 A.2d 958, 989 (D.C. 1984), *appeal after remand,* 547 A.2d 144 (D.C. 1988); *Afro-American Publ'g Co. v. Jaffe,* 366 F.2d 649, 654 (D.C. Cir. 1966) (*en banc).*

While the Defendant seems to argue that a statement is defamatory only if it is extreme and "odious" (Defendant's Brief at 11), defamation is simply that which injures a reputation in the popular sense; it diminishes the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.  *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000).  While it need not rise to the level of iniquity, such as child abuse or bigotry, defamation does necessarily include the "idea of disgrace," such as, for example, a suggestion of professional impropriety.  *Id.  See also Washington Herald Co. v. Berry,* 1914 U.S. App. LEXIS 2181 (D.C. Cir. 1914) (upholding a finding of libel where defendant accused plaintiff of being dishonest, and of pursuing a personal revenge campaign against defendant).

Moreover, "a publication may convey a defamatory meaning if it 'tends to lower the plaintiff in the estimation of a substantial, respectable group, though they are a

minority of the total community or [of the] plaintiff's associates.'" *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990) (quoting *Afro-American Publ'g Co. v. Jaffe*, 366 F.2d 649, 654 n.10 (D.C. Cir. 1966)). If the publication "obviously would hurt the plaintiff in the estimation of an important and respectable part of the community, liability is not a question of majority vote." *Guilford*, 760 A.2d at 594 (quoting *Peck v. Tribune Co.*, 214 U.S. 185 (1909) (opinion by Holmes, J.)).

Defamation also may be *per quod*, *i.e.,* arising by innuendo from published words in combination with known extrinsic facts, as well as *per se*, *i.e.,* appearing on the face of the publication. *Wilder v. Johnson Publ'g Co.*, 551 F. Supp. 622, 623-24 (E.D. Va. 1982); *see also Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 591-92 (1954) ("a defamatory charge may be made by inference, implication or insinuation"). The trial court's threshold task in an action for defamation is to determine whether the challenged statement is "capable of bearing a particular meaning," and "whether that meaning is defamatory." *Guilford*, 760 A.2d at 594 (citing RESTATEMENT (SECOND) OF TORTS § 614 (1) (1977)). The statements at issue should not be "interpreted by extremes, but should be construed as the average or common mind would naturally understand [them]." *Id.* If it appears that the statements are at least capable of a defamatory meaning, whether they were defamatory and false are questions of fact to be resolved by the jury. *Olinger v. American Sav. & Loan Ass'n,* 409 F.2d 142, 144 (D.C. Cir. 1969) (*per curiam*); *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990).

In retaliation against Delta for declining to market its DVD, defendant has undertaken a campaign to publicly impugn the reputation of Delta and its leadership. Defendant, relying heavily on innuendo, has sought to injure Delta's value and goodwill

in the eyes of its members and the public at large. The defamatory statements at defendant's website are not defendant's opinion; rather they are false statements involving alleged acts or omissions by Delta. And, beyond individual words and phrases, the tone of the FAQs taken as a whole disparages Delta by suggesting that Delta breached a duty to its membership by failing to act as defendant desired, and behaved improperly and dishonestly in its dealings with defendant. *See also Washington Herald Co. v. Berry,* 1914 U.S. App. LEXIS 2181 at **22 (noting that defendant's allegations, while not express, conveyed that plaintiff was dishonest).

While it is not necessary to repeat specific falsehoods that plaintiff details in its Complaint, examples are necessary to refute defendant's charges that plaintiff has failed to state a claim for which relief can be granted. Defendant states in the FAQs that it was "unable to generate a response" from the President of Delta when it contacted her.[3] This factually untrue statement, as Delta indicated in its Complaint, suggests to members and anyone else who reads the FAQs that Delta is not fulfilling its professional responsibilities. Defendant also states that "politics prevented reason," suggesting that the Board does not make prudent or merit-based decisions on behalf of Delta, but whimsical ones based only in sentiment. A perception that the Board acts so capriciously would certainly discourage members, potential members and collaborative partners from involvement with Delta. It is widely known that individuals or

---

[3]    The National President of Delta is the only authorized spokesperson for Delta and participates in all decisions by the Executive Board. Defendant's propensity for misrepresenting the facts apparently knows no limits. In seeking representation by local counsel in this area, defendant stated that it had approached Delta Sigma Theta Sorority about its plans to create the project, but Delta "ignored" it. As the trail of correspondence between Delta and defendant will establish, Delta did not ignore defendant. That defendant did not get its desired relief does not mean Delta ignored it.

organizations that have a reputation for being unresponsive or making decisions not based on prudent or reasonable judgment suffer adversely.

Critically, defendant suggests that Delta leadership provided members "misinformation." It does not take a "far-fetched interpretation" to understand that the common mind (the proper standard for defamation) would know misinformation means dishonesty and untruthfulness. Defendant in its brief attempts lingual gymnastics to persuade the Court that when it claimed Delta provided its members with misinformation, defendant actually meant something else. Defendant's response to "What is your response to the letter posted on Delta's webpage?" concludes with "Obedience to leadership is a good thing. Misinformation is not." A "common mind" would certainly infer the obvious from the innuendo – that Delta has misinformed its members.

To accuse the Delta Board of lying about its dealings certainly surpasses defendant's own threshold that defamation must involve "disgraceful behavior and a stain on Plaintiff's character." Defendants Brief at 11. Honesty and fair dealings are the benchmark qualities a Board is expected to maintain. Without the perception that a Board is honest, truthful and deals fairly, no one will support, engage with, or respond to an entity. As has been recognized, where the financial integrity, efficiency or honesty of an organization is defamed, a libel suit will be upheld. *Golden Palace*, 386 F. Supp. at 109.

The threat to Delta's reputation is broader than damage from a perception that it is a dishonest organization. As described in detail in its Complaint, Delta is much more than a collegiate social society. For almost 100 years, Delta has been internationally recognized as a leader at the vanguard of social and political activism, with a sterling

reputation. Its members are recognized for operating at the highest level of academia, politics and business. Since its inception, national political and policy leaders have readily recognized the quality of Delta's leaders and programs and frequently have sought Delta leaders for public service or as advisors. Examples of this recognition include: a speech by President John F. Kennedy at Delta's 50th Anniversary Celebration in Washington, District of Columbia in 1963; two invitations from President Lyndon B. Johnson to the Executive Board of Delta to meet with him; inclusion by President Clinton in a select group of community leaders invited to the White House in 1997; a meeting with Senator Bill Frist, Senate Majority Leader, in 2003 to discuss the Republican party's agenda.

As detailed in the Complaint, Delta is also sought after by major corporations, large non-profits, small businesses and individuals that seek partnerships or other business arrangements with Delta. Presently, there are numerous pending requests, from major corporations, other non-profits, and small businesses or individuals. These relationships would be jeopardized by damage to Delta's goodwill. *See, e.g., Ollman*, 750 F.2d at 974. ("A defamatory statement may destroy an individual's livelihood, wreck his standing in his community, and seriously impair his sense of dignity and self esteem.")

Defendant, with intent, published libelous statements designed to diminish public goodwill towards Delta and undermine Delta's relationship with its membership and the public. Defendant has seriously injured Delta, tarnishing its reputation, jeopardizing its standing in the community, and possibly reducing its membership ranks and the dues upon which it depends. Defendant's actions constitute defamation, and therefore the court should deny defendant's motion to dismiss plaintiff's claim for defamation.

## VII.    <u>CONCLUSION</u>

For the foregoing reasons, Delta respectfully urges this Court to deny defendant's motion to dismiss.  It is not beyond doubt that Delta can prove no set of facts that will entitle it to relief.

Respectfully Submitted,

/ss/

_____

Devarieste Curry, # 384621
Marc Miller, #948372

McLeod, Watkinson & Miller
One Massachusetts Avenue
Suite 800
Washington, D.C. 20001-0014

202-842-2345
202-408-7763 (facsimile)
dcurry@mwmlaw.com
mmiller@mwmlaw.com

Dated:  March 23, 2007

## Certificate of Service

I hereby certify that on March 23, 2007, I caused a copy of the attached, Opposition to Motion to Dismiss  to be served by ECR on counsel for defendant, Derek & Jamar Productions, LLC.

Respectfully Submitted,

/ss/

_____

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DELTA SIGMA THETA SORORITY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  06 1993 (RMC) |
| | ) | |
| DEREK & JAMAR PRODUCTIONS, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>ORDER</u>

Upon consideration of defendant's motion to dismiss the Complaint for failure to state claims upon which relief can be granted, and plaintiff's  opposition thereto, it is this

_____ day of April 2007,

ORDERED that the Motion be, and the same hereby is, DENIED, and it is further

ORDERED that, plaintiff's claim for misappropriation having been withdrawn, the Court rules with respect to plaintiff's federal common law trademark infringement claim, District of Columbia common law trademark claim, injurious falsehood claim, and defamation claim, plaintiff has alleged facts sufficient to give defendant fair notice of the claims asserted so as to able defendant to answer and proceed to discovery and trial, and it is further

SO ORDERED this_____ day of April 2007.


_____

Rosemary M. Collyer
United States District Judge

Attorneys to be notified:

**Counsel for Plaintiff:**

Devarieste Curry
McLeod, Watkinson & Miller
One Massachusetts Avenue, NW
Suite 800
Washington, D.C. 20001

202-842-2345
202-408-7763 (facsimile)
dcurry@mwmlaw.com

Marc E. Miller
McLeod, Watkinson & Miller
One Massachusetts Avenue, NW
Suite 800
Washington, D.C. 20001

202-842-2345
202-408-7763 (facsimile)
mmiller@mwmlaw.com

**Counsel for Defendant:**

David Z. Kaufman
Kaufman Law, A Professional Corporation
11350 Random Hills Road, Suite 800
Fairfax, VA 22030
703-764-9080
203-764-0014 (facsimile)
david@businessbrawls.com